(No. 95311.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ELIZABETH EHLERT, Appellee.

*Opinion filed May 20, 2004.*

194

THOMAS, J., joined by GARMAN, J., dissenting.
KILBRIDE, J., also dissenting.

James E. Ryan and Lisa Madigan, Attorneys General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers and Linda D. Woloshin, Assistant Attorneys General, of Chicago, and Renee G. Goldfarb and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

Steven Richards, Deputy Defender, and Allan R. Sincox, both of the Office of the State Appellate Defender, of Chicago, for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

Following a bench trial, the circuit court of Cook County convicted defendant, Elizabeth Ehlert, of the first degree murder of her newborn child (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)), and sentenced her to 30 years in prison. The appellate court reversed, finding the evidence insufficient to prove the child was born alive. 335 Ill. App. 3d 467. We granted the State's petition for leave to appeal. 177 Ill. 2d R. 315(a). For the reasons that follow, we affirm the judgment of the appellate court.

## BACKGROUND

On August 21, 1990, defendant gave birth in her bedroom, in the home she shared with her two sons, her father, and her fiancé, Steven King. Two days later employees of the Salt Creek Park District discovered the baby's corpse in a nearby lake. A creek that ran behind defendant's house fed into the lake. Defendant's conviction for murder was reversed on appeal because the prosecution presented irrelevant and highly prejudicial evidence at defendant's jury trial. *People v. Ehlert*, 274 Ill. App. 3d 1026 (1995).

On retrial, the prosecution presented several witnesses who testified that between April and mid-August 1990, defendant repeatedly told them she was not pregnant. She told the witnesses that she had a cancerous tumor and she had seen several doctors about it.

King, who first met defendant in January 1990, testified that he moved in with her shortly thereafter. In April 1990, King noticed that defendant was gaining weight. Defendant told King that she had a growth or a cyst for which she had seen a doctor. In May 1990, defendant told King that she was bleeding and had received treatment from a doctor. They also discussed the need for a dilation and curettage. Defendant twice scheduled the procedure but was not able to have the surgery done. On July 18, defendant told King that she had ovarian cancer. Later in July, defendant told King that she had seen another doctor, and, in that doctor's opinion, the tumors she had were not cancerous. Appointments to remove the tumors were cancelled because defendant told King she was bleeding. Subsequently, on August 17, defendant called King at work. She was hysterical. When King came home, defendant told King that tests at the doctor's office showed she was actually six to eight weeks pregnant but the fetus was dead. She also told King that the doctor gave her a shot to induce an abortion within 48 hours.

Around 3 a.m. on August 21, 1990, defendant woke

King up and told him she was in labor. King got out of bed. A few minutes later, defendant began screaming in pain. Rather than remain at her side and provide assistance, King left the bedroom because he did not want to see the miscarriage or the fetus. He did not turn the light on in the bedroom or the hallway. He did not press the alarm panic buttons on the security system in the hallway, which could have brought assistance from the police or paramedics. King further testified that he was hysterical, crying, frightened. He began pacing the hallway, living room and kitchen, and ventured into the basement. Twenty to thirty minutes elapsed. King then told defendant he was calling the paramedics. Defendant told King that her labor was almost over and asked him to get a plastic bag. He got a brown and green plastic bag from the cabinet under the kitchen sink. When he was 15 to 20 steps from the bedroom, he heard a single cry, lasting about two seconds. He took a few more steps down the hallway and asked defendant about the noise. Defendant replied he must have heard the family dog, which was in the bedroom. King did not question defendant further. Instead, without entering the bedroom, King reached in with the bag and, from the bed, defendant reached out and took the bag.

King testified that he next went to the living room area because he was not doing well emotionally. He did not hear any cries, sounds of choking or gasping for breath. He observed defendant, in her bathrobe, exit the bedroom and enter the bathroom. Defendant was not carrying the bag. She stayed in the bathroom for five minutes. During that time King did not hear any cries from the bedroom. Defendant returned to the bedroom. Again, without entering the bedroom, King repeatedly asked defendant if she was alright. Defendant told him to calm down. He heard some rustling as she picked up the bag but did not hear any crying or gasps for breath.

He went back to the living room and from there observed defendant leave the bedroom with the plastic bag, which looked half full. He did not ask her what she planned to do with the bag but inquired again if she was alright. Defendant went to the kitchen area and King heard the back door slam. He went into the kitchen. Defendant was not there. He did not look to see where defendant went. Defendant returned two minutes later. When he asked her what she had done with the bag, she responded that she had thrown it into the creek. Defendant returned to the bedroom, and King could hear that she was in pain, screaming. He did not call the paramedics or press the alarm panic buttons. Defendant asked him to come into the bedroom and he entered the room for the first time. Defendant, in bed, was in the process of delivering or had just delivered the afterbirth. King cleaned up by pulling the towels and sheets from under her, placing them in another plastic bag and taking the bag to the kitchen for later disposal.

In the morning, King was upset and crying. Defendant contacted King's mother, Mary Coward, who came over to the house. Coward asked King why he was upset. He related the whole episode to her and told her that he heard a baby cry. Later that day, King asked defendant about the cry he heard. She indicated that he had either heard the dog or imagined that he heard a cry.

On September 6, 1990, King was questioned at the police station. In a written statement, he told police that he was in the hallway with hands folded clenched, during the course of defendant's labor. Defendant asked him to get a bag from the kitchen. As he returned with the bag, he thought he heard a baby cry. King then told the police that he would like to see an attorney and was informed that would not be necessary. At that point, King did not feel like a suspect. Later that same day, King received a telephone call from Commander McGregor, who told him

that he did not think it was necessary for King to spend a lot of money on a lawyer. On cross-examination, King admitted that prior to the police interview, he was convinced he had either imagined the cry or heard the family dog. Also, at defendant's first trial, King testified that at the conclusion of the police interview he believed he was a suspect in the case and hired an attorney.

Mary Coward testified that at approximately 9 a.m. on August 21, 1990, King called to say that defendant had the miscarriage and that he would call her later. That afternoon, defendant called to say that King was very upset and defendant asked Coward to come over. Once at the house, Coward sat next to King on the bed and comforted him. Coward nowhere testified that King told her he heard a baby cry.

Police officers who spoke with defendant on September 6, 1990, testified that she told them she had miscarried a fetus 15 weeks old and flushed it down her toilet. Police told her they had talked to King. Defendant first said she threw the miscarriage in the garbage, then she said King threw it in the garbage. When officers said King told them a different story, defendant said she did not remember what happened, but King's account was probably true because "he doesn't lie." Police testified defendant admitted that she lied to King, and she had not seen any doctors throughout her pregnancy.

Further testimony showed that defendant told police her water broke two days before the birth, when she fell while trying to retrieve her son's toy from a tree in her yard. She placed the fetus in a garbage bag and left the bag by a tree near the bank of the creek out back. When police asked if she threw the bag into the creek, she said, "No, unless you want me to say I did it, then I did it." She then asked to have the baby buried next to defendant's mother. In another interview, defendant told police that her ex-husband, not King, was the father of the

baby. Defendant admitted that she had sexual relations with her ex-husband frequently in November 1989.

A few days later defendant called the police to say that she could not live with herself and wanted to tell them the truth. She asked police to assure her that King would take care of her children if she went to jail. Later she told police that when she went to the bathroom after delivering the dead fetus, King went to the bedroom, picked up the bloody towels and the baby and threw them out.

Dr. Mitra Kalelkar, assistant chief medical examiner for Cook County, testified at trial that when she completed the autopsy she could not determine to a reasonable degree of medical certainty that the baby had been born alive. She admitted that she found no unusual cause of death, so her "suspicion was that the baby drowned." On direct examination, the prosecutor asked Dr. Kalelkar whether, at the completion of the autopsy, she "form[ed] an opinion within a reasonable degree of medical certainty as to whether or not the baby was born alive." Dr. Kalelkar answered:

> "At that time I had a suspicion that this baby was born alive and that the cause of death would be drowning; and pursuant to that suspicion, which I related to the police officers, I instructed them to investigate further."

Dr. Kalelkar later reiterated that after the autopsy she told police she "could not tell for sure whether it had been born alive."

After police advised Dr. Kalelkar of their investigation, she concluded in December 1990 that the baby had been born alive and it had drowned. Dr. Kalelkar relied on evidence that defendant had lied to several persons about her pregnancy and her visits with doctors, and, most particularly, she relied on King's statement to police that he thought he heard a baby cry.

Dr. Kalelkar further testified she saw no evidence in the decomposing corpse of any natural disease process.

She found air in the lungs, hemorrhage on the skull due to natural causes, and some blood on the umbilical cord. Dr. Kalelkar admitted that the air she found in the lungs could have resulted from decomposition rather than breathing. She also stated that "there is no specific way of telling whether that rip [of the umbilical cord] was ante mortem or postmortem." Blood may remain in the umbilical cord after the baby dies. Lastly, while the hemorrhaging suggested that the baby was alive when the head went through the vaginal canal, it did not show that the baby survived the birthing process.

On cross-examination, Dr. Kalelkar admitted that a baby could die due to partial placental abruption. Furthermore, a baby could go into shock if it lost 60 milliliters of blood in the birthing process.

Two pathologists testified on defendant's behalf. Both pathologists agreed with Dr. Kalelkar that the autopsy findings could not support a finding to a reasonable degree of medical certainty that the baby was born alive. Dr. John Pless stated that the hemorrhage on the skull could occur even if the fetus had already died. Dr. Pless noted that if placental abruption killed the fetus shortly before delivery, one would expect findings like those present here. He further stated that a fall from a tree could cause the placenta to detach from the uterine wall and result in fetal death. The force of the fall need not be great if the trauma occurred at a place that maximized impact on the placenta. Dr. Pless testified that the baby could also have died from blood loss in the birthing process or obstruction of the airway. Water and bacteria probably would have eliminated any mucus plugs that might have caused asphyxiation.

Dr. Pless also agreed with Dr. Kalelkar that no marks on the body showed disease or physical injury. He noted that decomposition probably would have eliminated any evidence the baby died from infection. He also agreed

with other doctors that a newborn faces a greater risk of death from asphyxiation or blood loss in an unattended home birth than in a hospital delivery.

Dr. Robert Kirschner found there was sufficient evidence to conclude that the baby was alive when labor began. However, he found the evidence insufficient to show that the baby survived labor. Dr. Kirschner testified that even if the baby was alive at birth, it may have died from failure to clear its airways, blood loss or infection. He noted that, if a child had marked respiratory distress at the time of birth, it might give a feeble cry, then die. He agreed with the prosecutor that a cry would show live birth.

At the conclusion of the trial, the court expressly found credible King's testimony that he heard a baby cry. The court recognized that King might have adequate motive to lie and to tell the police that he heard a baby cry. However, had King wanted to minimize his involvement it would have been better for him to deny that the baby was born alive. The court found King's testimony, together with the medical testimony, sufficient to show that the baby was born alive. The court concluded that defendant was guilty of murder.

As noted by the appellate court, the circuit court did not comment on the medical testimony that the baby may have died after a live birth from various noncriminal causes. Also, the circuit court did not make any findings as to the cause of the baby's death or the criminal acts defendant committed resulting in the baby's death. The court sentenced defendant to 30 years in prison.

On appeal, defendant argued that the evidence was insufficient to show that the baby was born alive. Further, defendant maintained that, if the baby was born alive, the evidence was insufficient to show that defendant performed any act after birth to cause the death of the baby or that defendant had the mental state required

in a prosecution for murder. The appellate court agreed that the evidence was insufficient to prove live birth and reversed defendant's conviction. 335 Ill. App. 3d at 474. Because of its resolution of the issue of live birth, the court did not address the additional arguments for reversal.

We granted the State's petition for leave to appeal.

## ANALYSIS

In this court, defendant contends the evidence was insufficient to prove her guilty beyond a reasonable doubt. Defendant reprises her arguments that the State failed to show that the baby was born alive and, if the baby was born alive, that defendant committed a criminal act resulting in the death and defendant had the requisite mental state for murder.

A criminal conviction will not be set aside on appeal unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *People v. Tenney*, 205 Ill. 2d 411, 427 (2002). The question on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational fact finder could have found defendant guilty beyond a reasonable doubt. *People v. Brown*, 185 Ill. 2d 229, 247 (1998); *People v. Eyler*, 133 Ill. 2d 173, 191 (1989). This standard of review applies in all criminal cases whether the evidence is direct or circumstantial. *Tenney*, 205 Ill. 2d at 427; *People v. Gilliam*, 172 Ill. 2d 484, 515 (1996).

As noted above, the circuit court convicted defendant of the murder of her newborn. Proof of an offense requires proof of two concepts: first, that a crime occurred, or the *corpus delicti*, and second, that it was committed by the person charged. *People v. Cloutier*, 156 Ill. 2d 483, 503 (1993). In a prosecution for murder, the *corpus delicti* consists of the fact of death and the fact that death was produced by a criminal agency. *People v.*

*Garrett*, 62 Ill. 2d 151, 172 (1975). In addition, where the State alleges that the defendant has killed her newborn, the State must prove that the infant was born alive. *People v. Greer*, 79 Ill. 2d 103, 110 (1980); *People v. Ryan*, 9 Ill. 2d 467, 471 (1956). It is axiomatic that a defendant cannot be convicted of the murder of a person who has already died. W. LaFave, Substantive Criminal Law § 14.1, at 419 (2d ed. 2003).

The appellate court believed that the State failed to prove defendant's baby was born alive. In particular, the appellate court found insufficient the State's evidence that the baby showed signs of independent life once expelled from defendant's womb. The appellate court noted agreement between the prosecution's medical expert and defense experts that the physical findings alone did not prove live birth to a reasonable degree of medical certainty. 335 Ill. App. 3d at 471. The appellate court further noted that in reaching her conclusion that the baby was born alive, Dr. Kalelkar relied on King's statement to police that he thought he heard a cry. 335 Ill. App. 3d at 471. And, although Dr. Kalelkar recited evidence that defendant did not want the child and lied to neighbors about the pregnancy, she did not explain why an unwanted child would have a better chance of surviving the birth process or how that evidence in any way showed live birth. 335 Ill. App. 3d at 471. Lastly, the appellate court considered, and found wanting as proof of live birth, King's testimony that he heard a baby cry. 335 Ill. App. 3d at 471. The court found it significant that King did not see the baby when he heard the cry. 335 Ill. App. 3d at 471. The baby could have cried during the birthing process, and King could not testify otherwise. 335 Ill. App. 3d at 471.

Because the appellate court found insufficient the State's evidence that the baby was born alive, the court did not consider defendant's alternate arguments that

the evidence was insufficient to prove either criminal agency or the requisite mental state for murder. 335 Ill. App. 3d at 468.

In this court, the State argues the appellate court failed to apply the proper standard of review, that is, the appellate court failed to consider the facts in the light most favorable to the State, because the appellate court did not accept the fact that the baby cried. We disagree with the State's reading of the appellate court opinion. We believe the appellate court applied the appropriate standard of review.

The State also urges that we discard the common law requirement that a baby must be totally expelled from the mother's womb and establish independent life before it is considered alive. The State asserts that the common law requirement, necessary because of the lack of medical knowledge and high infant mortality rates prevalent in the 18th century, is now antiquated. According to the State, medical advances have eliminated the need for a presumption of death during childbirth. The State asks us to adopt the view of the court in *People v. Chavez*, 77 Cal. App. 2d 621, 176 P.2d 92 (1947), that a viable fetus "in the process of being born" is a human being within the meaning of the homicide statutes.

In *Greer* this court held that to be born alive a fetus must be totally expelled from the mother and show a clear sign of independent vitality. 79 Ill. 2d at 103. In urging that we adopt the reasoning of *Chavez*, the State is thus asking that we reconsider our ruling in *Greer*. In keeping with the doctrine of *stare decisis*, prior decisions should not be overruled absent good cause or compelling reasons. *People v. Robinson*, 187 Ill. 2d 461, 463-64 (1999); *Moehle v. Chrysler Motors Corp.*, 93 Ill. 2d 299, 304 (1982). Further, we note that the State has raised arguments in this case that were considered by the court in *Greer*. We need not opine on the merits of the State's

arguments, however, because we note an alternate basis for reversal of defendant's conviction. Defendant argues, and we agree, that even assuming the baby was born alive, the evidence was insufficient to show that death resulted from defendant's criminal agency.

The State's theory of the case was that defendant, having hidden her pregnancy, gave birth to a live baby, placed the baby into a plastic bag, and either threw the bag into the creek or placed the bag next to the creek where an animal presumably dragged it into the creek. To prove this theory, the State presented evidence from King, defendant's paramour. King's testimony was that, when he was 15 to 20 steps from the bedroom, he heard a single cry, lasting about two seconds. King proceeded down the hallway to the bedroom. Without entering the bedroom, King reached in with the bag and, from the bed, defendant reached out and took the bag. King testified further that, after he handed the plastic bag to defendant, he did not hear any cries, sounds of choking or gasping for breath. Defendant left the baby unattended in the bedroom for five minutes. During that time, King did not hear any cries from the bedroom. King saw no signs of motion in the bag when defendant took the bag from the house.

The State also relied on the testimony of the medical examiner, Dr. Kalelkar. At the time of the autopsy, Dr. Kalelkar found no unusual cause of death. No marks on the baby revealed foul play. Dr. Kalelkar testified on direct examination that, after performing an autopsy, she surmised that the baby drowned. Dr. Kalelkar distinguished between cause of death and manner of death: "The manner basically is the circumstances surrounding death" and could be natural, homicide, suicide, accident, or undetermined. After Dr. Kalelkar performed the autopsy, she suspected that the baby was born alive because the body had hemorrhaging on the head, aerated

lungs, antemortem bleeding around the umbilical cord, and no natural diseases. Dr. Kalelkar then stated both that she did and that she did not determine the cause of death at the time of the autopsy to a reasonable degree of medical certainty. On direct examination, Dr. Kalelkar initially asserted, "At the time when I did the autopsy, \*\*\* I did not form an opinion. I verbalized to the police officers what my suspicions were or what I thought had happened to this child, and I instructed them to go and get or to investigate the matter further." When asked by the prosecutor when she formed her opinion regarding the cause of death, Dr. Kalelkar responded, "As to the cause of death was [sic] pretty obvious at the time that I did the autopsy because of the fact that the baby was recovered from water." The prosecutor clarified that he was addressing the cause of death, not the manner of death. Dr. Kalelkar then stated:

"In my opinion, and I so verbalized it to the police officers who were present at the time of the autopsy, that based on the fact that this body was recovered from water and based on the fact there was no evidence of any other cause of death, injuries or natural disease processes, the cause of death would be drowning."

Thus, Dr. Kalelkar apparently determined the cause of death at the time of the autopsy, but did not determine the manner of death until she consulted with the police. Still, on the death certificate, she handwrote "pending police investigation" in the space for cause of death and left blank the space for manner of death.

After Dr. Kalelkar advised the police of her suspicions, the police later advised her of the results from their investigation, which confirmed her suspicions, including her initial impression that the infant was born alive. In fact, Dr. Kalelkar observed that a "very significant" part of the police report was the fact that King "heard a sound which was akin to a baby crying." Dr. Kalelkar continued: "[H]earing the baby cry is an indication that a baby is

born alive, and my physical findings showed that there was air in the lungs. Now granted that air in the lungs could have come from decomposition changes, but given this fact as well as the physical findings and all the other facts surrounding this case, everything tied together." Dr. Kalelkar listed the manner of death "based on all the circumstances" as homicide.

On cross-examination, however, Dr. Kalelkar's account of her opinions changed. She testified that at the time of the autopsy, she could establish neither a cause nor a manner of death:

"Q. And at the end of the time that you completed that autopsy you told those police officers that you could not determine for sure whether or not this baby was born alive, right?

A. At the time I only had a suspicion. That is correct.

Q. And you told them that you suspected that the cause of death would be drowning if you could prove that the baby was born alive, right?

A. I don't recall what I told them exactly, but I do remember that I suspected that the baby was born alive because it was a full-term baby and I did not find any natural cause of death, and that the cause of death was drowning because the baby was found in water.

Q. Okay. But you told them that you could not tell for sure whether it had been born alive at that point, right?

A. I agree.

Q. Okay. And you told them that you couldn't establish or prove at that point what the cause of death was, right?

A. That is correct also.

Q. You didn't tell them I know the cause of death but I can't give you a manner of death at that point, did you?

A. No, I did not.

Q. And at that point you filled out or shortly after that you filled out a death certificate in which you put, under cause of death, pending police investigation, right?

A. That is correct.

* * *

Q. And down a little bit lower on the left part of the

certificate there is a space where you can put the manner of death such as natural or homicide or whatever, right?

A. That is correct.

Q. Now you didn't put anything in there?

A. No. That was left blank.

* * *

Q. All right. And you later then changed the death certificate in the sense that you filled in homicide [as the manner of death] and you put in drowning as the cause of death, right?

A. Correct.

Q. So essentially between the time that you filled out that first death certificate and the time you filled out the second death certificate, what you got was information from the police, right?

A. Yes.

Q. It wasn't a matter of you having gotten further information from your autopsy that caused you to change the death certificate, was it?

A. There was no change in the death certificate. There was not, you know—There was no change in the cause of death, yet the police investigation just confirmed what I had originally suspected as to the cause of death."

Dr. Kalelkar agreed that the final death certificate was a "sort of continuation" of what she had done before receiving the police reports. According to Dr. Kalelkar, this was a generally accepted practice in her field.

One of the defendant's forensic experts, Dr. Pless, disagreed that it is a generally accepted practice among forensic pathologists to base cause of death opinions on information in police reports:

"We are engaged in a scientific discipline in which the opinions regarding cause of death need to be related to findings in the examination, specifically in the case of forensic pathology in the autopsy. And if those findings aren't there, then it's inappropriate to develop an opinion based on what someone heard or said. That's completely outside the discipline of science."

But Dr. Kalelkar's drowning surmise is problematic for another reason. King testified that, after hearing

what he thought was a short cry from outside the bedroom door and down the hall while defendant gave birth, he did not hear the baby or see her move inside the plastic bag during the 5 to 10 minutes before defendant disposed of the bag. Further, Dr. Kalelkar did not find debris in the baby's lungs or in the air passages. She also did not find evidence of pulmonary edema, indicative of water in the lungs. Such findings, although not present in all cases, can lend support to a conclusion that death is by drowning. Justices Thomas and Garman note that King "would not hear cries or see the baby move if defendant had already suffocated it." 211 Ill. 2d at 231 (Thomas, J., dissenting, joined by Garman, J.). In response to a question by the trial judge, Dr. Kalelkar discounted this theory: "It could be suffocation, but the fact is that the baby was found in water. So automatically because the baby is found in water, you know, I determined it was drowning."

In addition to the fact that there is no evidence of record to suggest that defendant suffocated the infant, on cross-examination Dr. Kalelkar agreed that the infant could have died from natural causes: anoxia from a displaced placenta, asphyxiation by mucus or other fluids, or loss of blood and shock. Evidence that defendant placed her already-dead infant's corpse in a plastic bag, then placed that bag near or into a creek feeding into a golf course retention pond, shows that defendant is capable of doing terrible and desperate things. We require more of the State than this in a murder prosecution.[1]

Looking at the evidence in the light most favorable to

[1]Unlike the defendant in *People v. Ryan*, 9 Ill. 2d 467 (1956), upon which Justices Thomas and Garman rely, defendant here was not charged with or convicted of involuntary manslaughter. Moreover, in *Ryan*, the defendant was a registered nurse employed by two doctors and had from time to time assisted in the prenatal care of pregnant women. She told the police that the baby had "cried once and that it had moved its little arms." In the present

the prosecution, we are left with a reasonable doubt as to defendant's criminal agency. As this court emphasized in *People v. Martin*, 26 Ill. 2d 547, 551 (1963), the relationship between the defendant's "criminal agency and the cause of death [may not be] left *** to inference and speculation." This court may reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001).

We note that in analogous circumstances, the courts of sister jurisdictions reversed convictions for insufficient evidence of the mother's criminal agency. *State v. Doyle*, 205 Neb. 234, 238, 287 N.W.2d 59, 62 (1980) ("At best the evidence, almost exclusively circumstantial in nature, disclosed that a child was born to the defendant and that the child died. The pathologist was unable to testify as to any cause of death and could not testify that the cause of death was not from natural causes"); *Lane v. Commonwealth*, 219 Va. 509, 515, 248 S.E.2d 781, 784 (1978) ("We hold that the evidence was insufficient to show beyond a reasonable doubt that the child's death was caused by a criminal act of the defendant and that the *corpus delicti* had not been proved"); *Graham v. State*, 6 Ark. App. 376, 642 S.W.2d 342 (1982). See also *Taylor v. State*, 108 Miss. 18, 25, 66 So. 321 (1914) ("The examination of the body of the child by these physicians failed to disclose any evidence of violence to its person, and their opinion that it died from suffocation seems to be based upon the fact that their examination also failed to disclose any reason why the child should have died from a natural cause").

---

case, defendant was not a nurse by training. Further, defendant never admitted hearing the baby cry or seeing any other sign of life in the baby. Where a jury could have found the defendant in *Ryan* guilty of involuntary manslaughter on the facts presented at trial, proof that defendant in the case at bar is guilty of murder is wanting.

Justices Thomas and Garman clearly disagree with our conclusion in this matter, and we feel compelled to address several aspects of their separate opinion as well as comment on the disparaging tone and tenor they use in the opinion. As an initial matter, we take issue with their characterization of our holding. Today's opinion does not, in any way, make it legal in Illinois for a mother to murder her newborn infant. See 211 Ill. 2d at 216 (Thomas, J., dissenting, joined by Garman, J.). Infanticide remains a crime in Illinois. What today's opinion does do, however, is reaffirm this court's commitment to the time-honored notion that, in Illinois, a conviction for murder will not be allowed to stand in the absence of proof beyond a reasonable doubt that the convicted defendant caused the victim's death.[2] The implication that the

---

[2]Justices Thomas and Garman cite *Campbell v. People*, 159 Ill. 9 (1895), in support and suggest that "the majority would be wise to study" the principles set forth therein. See 211 Ill. 2d at 232 (Thomas, J., dissenting, joined by Garman, J.). In *Campbell*, the prosecutrix testified that her newborn moved and cried just before the defendant, purportedly the baby's father, wrapped the newborn in a quilt, carried it out of doors between ten and eleven o'clock at night, and returned about half an hour afterward without it. The baby was never seen or heard of again and a jury found the defendant guilty of murder. On appeal, we recognized that circumstantial evidence, of the most cogent and convincing character, may be used to show the fact of death as well as the criminal agency of the accused in producing it. *Campbell*, 159 Ill. at 22. However, we overturned the defendant's conviction because the evidence was insufficient. In doing so, we noted: "There is doubtless a possibility of his guilt, but we are constrained to say that the evidence is insufficient to establish his guilt beyond a reasonable doubt. We think it would be establishing a precedent fraught with much danger to sustain this judgment upon the evidence set out in this record. Upon another trial other facts and circumstances may possibly be shown which may tend to dissipate the doubts which must arise in any candid mind upon reading the evidence as now presented." *Campbell*, 159 Ill. at 28. Far from

justices in the majority clearly sanction infanticide is unfounded and has no place in proper judicial discourse.

Justices Thomas and Garman assert:

> "The majority seems to base its entire reversal on a curious critique of the medical examiner's testimony. The bitter irony here is that what troubles the majority about Dr. Kalelkar's conclusion is the precise problem with the majority's own analysis. The majority is actually troubled by the fact that Dr. Kalelkar considered the known facts of the case in reaching her conclusion that the baby drowned. Of course, the absence of such an analysis is the glaring flaw in the majority's own opinion. The majority focuses solely on the medical testimony involving the baby and fails to consider all of the other circumstantial evidence pointing directly to defendant's guilt." 211 Ill. 2d at 229 (Thomas, J., dissenting, joined by Garman, J.).

The conclusion that we reach is neither curious nor "bitter[ly] iron[ic]." We do not say that nothing matters except for the medical testimony. The State said that, by implication, when it offered nothing else to prove defendant killed her infant. Certainly, the record is replete with evidence of what Justices Thomas and Garman characterize as defendant's "deceit." The flaw in their dissent is their willingness to equate this deceit with evidence of criminal agency.

Defendant need not disprove her guilt. An accused's right to demand proof of the State's case beyond a reasonable doubt is a protection of "surpassing importance." *Apprendi v. New Jersey*, 530 U.S. 466, 476, 147 L. Ed. 2d 435, 447, 120 S. Ct. 2348, 2355 (2000). This right has formed the bedrock of constitutional criminal procedure for centuries: "Although virtually unanimous adherence to the reasonable-doubt standard in common-law jurisdictions may not conclusively establish it as a

---

supporting Justices Thomas and Garman, our opinion in *Campbell* reflects the principle that an accused may not be convicted of murder upon evidence that is unsatisfactory and that leaves a reasonable doubt as to the accused's guilt.

requirement of due process, such adherence does 'reflect a profound judgment about the way in which law should be enforced and justice administered.' " *In re Winship*, 397 U.S. 358, 361-62, 25 L. Ed. 2d 368, 374, 90 S. Ct. 1068, 1071 (1970), quoting *Duncan v. Louisiana*, 391 U.S. 145, 155, 20 L. Ed. 2d 491, 499, 88 S. Ct. 1444, 1451 (1968). Thus, our opinion is not a blueprint for murder, but rather a blueprint echoing a concept that has well served the Anglo-American criminal justice system since the Magna Charta was signed in 1215—namely, due process of law. We are unwilling to redraft that august guarantee.

Simply stated, the fact that defendant is "probably" guilty does not equate with guilt beyond a reasonable doubt. We must point out that in criminal prosecutions, the standard of proof is not by a preponderance of the evidence, but rather proof beyond a reasonable doubt.[3]

---

[3]Justices Thomas and Garman suggest that we have adopted a different standard, and, moreover, have applied that standard only where the victim is an infant. 211 Ill. 2d at 216 (Thomas, J., dissenting, joined by Garman, J.). The justices cite our recent opinion in *People v. Milka*, 211 Ill. 2d 150 (2004), to show that, where the victim is not an infant, a conviction may be sustained with proof no more certain than that adduced in the case at bar. We disagree with the characterization of the strength of the evidence in these disparate cases. In *Milka*, the lifeless body of Brittany Martinez, an 11-year-old girl, was discovered on a sandbar in the Kishwaukee River, a 30- to 40-minute drive from her home in Elgin. Brittany had been sexually assaulted and a piece of masking tape, 10 to 12 inches long, ran from her right ear, under her chin, and up toward the left ear. A jury found the defendant guilty of murder based on evidence at trial which included the defendant's palm print and Brittany's blood on a McDonald's cup the police recovered from the defendant's car. We affirmed the defendant's conviction, noting "the evidence presented at trial, when viewed in the light most favorable to the State, allowed the jury to find that (1) defendant was the last person to see Brittany alive, (2) Brittany died between 6 p.m. and 9 p.m. on May 8, 1997, (3) defendant

We acknowledge that on any particular issue conscientious jurists can respectfully disagree, and it is the prerogative of Justices Thomas and Garman to take issue with the majority's analysis. However, these justices should do so in a civil and judicious manner. The dissent Justices Thomas and Garman filed today borders on demagoguery when the dissenting justices choose to cross the bounds of collegiality by insisting that the members of the majority have "irresponsibl[y]" ignored evidence (211 Ill. 2d at 217, 249 (Thomas, J., dissenting, joined by Garman, J.) and "disingenous[ly]" warped the standard of review in order to free a convicted murderer. Suffice it to say, it is difficult for this court to expect practitioners to engage in civility in the practice of law when members of this court are unwilling or unable to engage in respectful legal discourse in a published opinion.

Finally, the prediction by Justices Thomas and Garman that murderers will use this opinion as a guide to commit their crimes is unrealistic. First, it assumes that criminal minded mothers intent on killing their newborn infants will consult this court's opinions before they act. Second, and more importantly, it assumes that the State will often have to proceed to trial against a defendant charged with murdering her newborn infant armed with only equivocal testimony from the medical examiner regarding the cause and manner of death based on testimony from the defendant's boyfriend, who may have

---

lied to the police regarding his whereabouts during those hours, (4) the blood in defendant's car was the result of vaginal tears suffered by Brittany, and (5) defendant accurately described the location of Brittany's body before her body was discovered. This evidence was sufficient for the jury to find, beyond a reasonable doubt, that defendant caused Brittany's death." *Milka*, 211 Ill. 2d at 183. Today, we remain convinced of the strength of the evidence supporting the defendant's conviction in *Milka* and of the unsatisfactory nature of the evidence the State presented in the case at bar.

heard a short cry, but saw nothing. The holding in this case is as unique as its facts and is limited to them.

## CONCLUSION

Our observations in *People v. Smith*, 185 Ill. 2d 532 (1999), regarding the burden of proof the prosecution must meet to obtain a criminal conviction are most appropriate in this case:

"What is involved here is the standard of proof which is applicable to all crimes. That is to say, conviction beyond a reasonable doubt. Whether the crime charged be trespass, shoplifting, armed robbery, or murder, the test is the same. The burden of meeting this standard falls solely on the prosecution. If it fails to meet this burden, a defendant is entitled to a finding of not guilty. No defendant is required to prove his innocence.

While a not guilty finding is sometimes equated with a finding of innocence, that conclusion is erroneous. Courts do not find people guilty or innocent. They find them guilty or not guilty. A not guilty verdict expresses no view as to a defendant's innocence. Rather, it indicates simply that the prosecution has failed to meet its burden of proof. While there are those who may criticize courts for turning criminals loose, courts have a duty to ensure that all citizens receive those rights which are applicable equally to every citizen who may find himself charged with a crime, whatever the crime and whatever the circumstances. When the State cannot meet its burden of proof, the defendant must go free. This case happens to be a murder case carrying a sentence of death against a defendant where the State has failed to meet its burden. It is no help to speculate that the defendant may have killed the victim. No citizen would be safe from prosecution under such a standard." *Smith*, 185 Ill. 2d at 545-46.

As in *Smith*, we do not imply that defendant is innocent of the crime charged. The State's evidence of criminal agency resulting in death was simply insufficient. This court cannot affirm a conviction based on speculation and conjecture. Accordingly, we affirm the judgment of

the appellate court reversing defendant's conviction of murder.

*Appellate court judgment affirmed.*

JUSTICE THOMAS, dissenting:

For all practical purposes, it is now legal in Illinois for a parent to murder his or her newborn infant. With today's decision, the majority sends the clear signal that, when a parent is charged with murdering a newborn baby, this court will not apply the standard of review in the same manner as we would in any other criminal case. We will draw previously unheard of inferences and presumptions in favor of the defendant and will reward the defendant for attempting to cover up the crime. The majority's opinion is misleading on the facts, incorrect in its application of the standard of review, and perverse in its implications. I dissent in the strongest possible terms.

As the majority correctly notes, the standard of review that we must apply is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational fact finder could have found defendant guilty beyond a reasonable doubt." 211 Ill. 2d at 192, citing *People v. Brown*, 185 Ill. 2d 229, 247 (1998). I will demonstrate below that the majority does not apply this standard. Indeed, it appears that the standard of review the majority applies is, "viewing the evidence in the light most favorable to the defendant, can we imagine a scenario, no matter how far-fetched, in which the defendant might be innocent?" The State argues that the defendant is essentially arguing for this court to revive the long-abandoned "reasonable hypothesis of innocence" test. Of course, there is no reasonable hypothesis of innocence on these facts, only an unreasonable one. In my view, no rational trier of fact could look at the evidence in this case and *fail* to be convinced of defendant's guilt. But when we must decide only whether *any* rational trier of fact could have found defendant's guilt

beyond a reasonable doubt, this becomes an easy case. I believe that Judge Tobin was a rational trier of fact and that her finding of defendant's guilt must be affirmed.

I first take issue with the majority's irresponsible statement of facts, which both trivializes and omits evidence favorable to the prosecution while focusing heavily on evidence favorable to defendant. In a sufficiency of the evidence appeal, in which we must view the evidence in the light most favorable to the prosecution, a dissenting justice should never be put in the position of setting forth for the first time evidence favorable to the prosecution. If this court is going to reverse a conviction because the evidence was insufficient, we have an obligation to set forth all of the evidence favorable to the prosecution so that the reader will know what this court deems insufficient. The majority's omission of this evidence is particularly troubling because it criticizes the State for putting on no evidence of guilt other than the medical examiner's testimony. 211 Ill. 2d at 209. The State actually did put on quite a bit of evidence of guilt other than the medical examiner's testimony. Unfortunately, the majority confuses its own failure to grasp the significance of this testimony with the State's failure to put on the testimony in the first place. Thus, before getting into a discussion of why the majority opinion is legally flawed, I will flesh out some more of the trial testimony, so that the reader will have a true and fair picture of the evidence admitted against defendant.

The prosecution presented numerous witnesses to show the pattern of lies and deception defendant engaged in preceding the baby's birth. The majority sets forth a few of the lies defendant told to Steven King, but summarizes the testimony of the other witnesses in two sentences: "On retrial, the prosecution presented several witnesses who testified that between April and mid-August 1990, defendant repeatedly told them she was

not pregnant. She told the witnesses that she had a cancerous tumor and she had seen several doctors about it." 211 Ill. 2d at 195. In my opinion, these two sentences do not give the reader a fair view of the extent of defendant's deceit.

Jo Ann Ripp was defendant's hairdresser, and Ripp's children played with defendant's children. In April 1990, Ripp noticed that defendant's stomach was getting larger. Defendant told her that she had a cyst in her abdomen. When defendant returned in May, Ripp noticed that her stomach had become much bigger, and Ripp believed that defendant was pregnant. However, defendant said that she had a cancerous tumor. When Ripp saw defendant in August, Ripp believed that defendant had a full-term pregnancy. Defendant again told Ripp that it was a cancerous tumor and that she did not have time to have it taken care of. Ripp spoke to defendant on the phone later that month, and defendant told her that she had the tumor removed and was experiencing bleeding, cramping, and nausea. When Ripp saw defendant on August 29, defendant looked like a postnatal woman. Ripp had heard reports about the baby that was found in the water, and she contacted the police. Ripp saw defendant again on September 10, three weeks after the birth. At this time, defendant claimed that she was currently pregnant with a "high risk pregnancy." Ripp testified that she was "floored" by this statement.

Mary Coward, Steven King's mother, saw defendant once or twice a week during 1990. In April, Coward thought that defendant looked pregnant and she mentioned this fact to her husband. Coward asked her son if defendant was pregnant, and King and defendant both denied it. In May, Coward accompanied defendant to one of defendant's son's baseball games. Defendant said that she was not feeling well and that she had just had surgery. She claimed to have tumors and that she was

having them "taken care of." Defendant claimed to have been "packed." Later in May, defendant asked Coward to baby-sit because she needed to have surgery for her tumors. However, defendant did not ultimately go to the hospital because she cut her leg. Around the first of July, several people, including King and defendant, went to Bob Chinn's Crab House to celebrate Coward's birthday. Defendant was wearing what appeared to be a hospital I.D. bracelet.[4] She claimed that she had had preadmission tests and was scheduled for surgery the following day. However, when the next day arrived, defendant did not go in for the surgery. Coward was supposed to baby-sit on that day, but King called her to say that defendant was not going in for the surgery because she was hemorrhaging. The supposed scheduling and cancelling of the operation happened several times over the next few days. Later in July, defendant told Coward that she had ovarian cancer. In a subsequent call, defendant told Coward that she was overjoyed because she found out she did not have cancer after all.

In early August, Coward was supposed to have taken defendant to see a Dr. Shaw. On the day of the appointment, King told Coward not to hurry because defendant had cut herself on a glass and had to get stitches. Defendant and Coward did not go to see Dr. Shaw. At a housewares party later that month, Coward saw defendant and thought she looked "really pregnant." Defendant said that her tumors would be removed in a few days and that she would then be in good shape. On August 17, defendant and King went to Coward's house.

---

[4]The presence of this hospital bracelet was never explained. The evidence was clear that defendant never sought prenatal care and that all of her cancer stories were false. In his closing argument, the prosecutor argued that it could possibly explain why defendant had not simply sought an abortion. He argued that perhaps she *had* sought an abortion at this time and was told that it was too late.

At this time, defendant told Coward that she was pregnant with a four-week-old fetus and that the baby had died. She claimed that a doctor had given her a shot to induce labor and then sent her home.

On the morning of August 21, King called his mother to say that defendant had had a miscarriage the night before. Later, defendant called Coward and told her that King was very upset. She asked Coward to come over to see if there was anything she could do. When Coward arrived, she tried to comfort King who was still very upset. Defendant was sitting in the kitchen drinking coffee, and she did not appear upset. Coward wanted defendant to see a doctor. Defendant got on the phone several times and reported that the doctor could not see her because he was in the operating room. On August 25, Coward took defendant to see a Dr. Levy. When she came out of the doctor's office, defendant was upset and told Coward that she had to have a hysterectomy.

June Powers testified that she has been friends with defendant since 1979. In June of 1990, Powers noticed defendant was wearing baggier clothes than she usually did. She further noticed that defendant's "rear end was very wide." In mid-August, Powers spoke with defendant on the telephone. Defendant told Powers that she had seen the doctor and had been told that she had cancerous uterine tumors and would have to have a hysterectomy. Defendant said that she was upset because this meant that she would not be able to have children with King. A week later, Powers spoke with defendant again. At this time, defendant said that she had received a second opinion on the tumor situation and that this doctor told her that it was not tumors, and that she was carrying a 15-week-old fetus. She said that the doctor had given her an injection that would make her deliver the baby within 72 hours; she was sent home to do this. A few days later, defendant contacted Powers and told her

that she had delivered a dead fetus and that it was the most painful experience she had ever had. Steve had helped her clean up the mess. Over the next several days, defendant called Powers several times. She complained of bleeding and being in pain and she was concerned about Steve's attitude towards her.

On September 6, defendant called Powers to say that she had been questioned by the police and that she was concerned. Defendant said that a dead baby had been found in a reservoir. Powers asked why she would be concerned if she had delivered a dead 15-week-old fetus. Defendant said that she was concerned because King was speaking to the police and she did not know what he was telling them because he was not speaking to her. In a subsequent conversation, defendant began by telling Powers that she was in "deep shit." The police had questioned her and were going to connect her to the baby that was found. Powers again asked why she had anything to worry about if she had delivered a 15-week-old fetus. Defendant responded that she was concerned because she did not know what happened on the night of the delivery. The police wanted to know if the baby had cried. Defendant said, "what if the baby cried and Steve did do something?" Defendant also said, "what if they test the baby and it's mine? I'm going to jail." In September, defendant told Powers that "no matter what happens, the police are going to crucify us." She was concerned that her family was going to be taken away, and she asked Powers to take her children if something happened to her.

Janice Singer became friends with defendant in 1990 after their sons became friends at school. In July of that year, Singer noticed that defendant's hips were becoming wider and that defendant was developing a potbelly. Singer made a comment about defendant's pregnancy, following which defendant laughed and said that she was

not pregnant, she had a cancerous tumor. On several occasions, Singer watched defendant's kids so that defendant could go to the doctor. She mentioned several doctors' names, and the one she mentioned most often was Dr. Tunca. In August, defendant told Singer that the doctors wanted her to have exploratory surgery for the cancerous tumor, and they even mentioned the possibility of a hysterectomy. In the middle of August, defendant told Singer that the exploratory surgery had revealed that she was pregnant with a 15-week-old fetus that had died in utero. She said that the doctor was going to give her a drug to induce labor, following which she was to go home and wait for it to happen. Defendant showed no emotion, and these conversations were very matter of fact. On August 20, defendant called Singer to tell her that she was in labor and that it was very painful. The next day, defendant called Singer to tell her that she had delivered the baby during the night and that it had been difficult and painful. Singer asked what she did with the baby, because usually the doctors would want to see the fetus. Defendant said that King put the baby in a bag and got rid of it. The following day, defendant told Singer that she was hemorrhaging and bleeding a lot. Singer asked if she had been to the doctor, and defendant said "no."

In mid-July, defendant called King at work and told him that she had seen Dr. Elrad, who had diagnosed her with ovarian cancer. This was the first time that King had heard of the appointment. King wanted her to get a second appointment, so he got the name of Dr. Gardner from a friend. From Dr. Gardner, he got the name of Dr. Tunca. In early August, defendant told King that she had scheduled an appointment with Dr. Tunca, but that she had to cancel it due to bleeding and reschedule it for the following day. On that day, however, defendant told King that the appointment was cancelled because no

operating rooms were available and that it was now rescheduled for the following Saturday. On Friday, defendant called Steve and she was crying and hysterical. She told him that she had been to see Dr. Tunca and that he diagnosed her with a six- to eight-week-old stillborn baby. Defendant told King that Dr. Tunca had given her an injection to induce labor within 48 hours.

Dr. Josh Tunca testified that he is board certified in obstetrics and gynecology. His specialty is gynecological oncology, which he explained as being a gynecology cancer surgeon. He is the only Josh Tunca in Chicago who practices medicine. Defendant was never his patient, and he never got a call from defendant regarding a miscarriage. Tunca never gave a patient medication to induce labor and then sent the patient home.

Dr. Hiam Elrad confirmed that defendant had been his patient in the past, but that he did not see her in 1989 or 1990. Dr. Elrad further testified that there was no procedure in 1990 for giving a woman a shot and sending her home to deliver a fetus. Additionally, he explained that the term "packing" meant filling the uterine cavity with gauze to stop bleeding, but this procedure had not been used in the past 15 years. Even when it was used, a person would not simply have been packed and then sent home.

The above is not a complete account of all of the prebirth-deception evidence introduced by the prosecution, but it is sufficient to give the reader a fair picture of what was going on. Next, I will flesh out a little more fully the various statements defendant made to the police during their investigation.

Defendant was first interviewed by the police on September 6, 1990. Defendant was informed that the police were investigating the death of a baby found in the Twin Lakes reservoir. The creek behind defendant's house fed into the reservoir, and the police had received

information that defendant had delivered a baby at home two days prior to the discovery of the baby. Defendant said that she had miscarried a 15-week-old fetus and that the baby found in the reservoir was a full-term baby. When asked how she knew it was 15 weeks old, defendant said that Dr. Gardner told her this. When the police asked how he could know how old the fetus was if it no longer existed, defendant replied, "I don't know, ask him." The police had not told her that the baby found in the reservoir was full-term, but defendant had read this in the paper. Defendant said that she had flushed the fetus down the toilet, so the baby could not be hers. When the police told her they had spoken to King and knew the truth, defendant then said that she threw the baby in the garbage. One of the officers responded that King said that she had thrown it into the creek. She then said that King had thrown it in the garbage. She reiterated that the fetus had only been "a glob of blood" and could not have been the baby found in the lake. The police told her that DNA testing could possibly show that the baby was hers, and defendant responded, "I don't know. I don't think. I don't remember. I tried to block the whole incident out of my mind."

The police resumed this interview later in the day, after defendant had picked up her son from school. This time, defendant said that she needed to speak with King to find out what he had told the police. Defendant was informed that King was at his mother's house, so she tried to reach him there. When she could not get hold of him, she told the officers that "whatever Steve said is the truth." Defendant still claimed not to remember much of what happened that night but said that whatever King said was probably the truth because "he doesn't lie." She told the police that she had fabricated the story about being given a shot to induce the labor of a dead fetus. Indeed, she confessed that she had not seen any

physicians prior to the baby's birth. Defendant was asked if she could have been seen out by the creek that night, and she responded, "I don't think so. I don't know. I don't remember." Defendant continued to say that the police should speak to Dr. Gardner, following which she picked up the phone, dialed a number, and asked for Mike. Defendant explained that Mike was a lawyer who told her not to talk to the police.

On that same evening, defendant called Sergeant Robert Roszak of the Palatine police department. Roszak had been friends with defendant for a couple of years. He had also noticed that she appeared pregnant in 1990, and she told him that she had a cancerous tumor. Defendant asked Roszak to stop by the house. Defendant told him that two of his colleagues had questioned her. She said that she had had a miscarriage that lasted a few minutes, and that she did not remember if it happened in the bedroom or in the bathroom. When it was over, she asked King to put the miscarriage in a jar, but he did not want to. He placed the baby in a garbage-type sack and said that he would throw it away on his way to work. Further, defendant claimed that she went to visit Dr. Levy in Arlington Heights the morning after the miscarriage, and he told her she had delivered a 15-week-old fetus. Then she said that she remembered that it did happen in the bedroom and that she had given birth only to "clumps." Defendant wondered aloud if maybe she was psychotic and did things that she did not know. Finally, she said, "Whatever it was, I did it. What did Steve say? He is very honest. Whatever he said, I did. It's like I'm psychotic and I don't know."

Later that night, when Roszak had returned to the station, he got a phone call from defendant, who wanted to meet him at a restaurant. The restaurant was closed, so they ended up at a bar. Defendant told Roszak that the baby was the child of John Stevens, her ex-husband

and the father of one of her children. She had frequent sexual relations with him in the fall of 1989, especially during November. Defendant described herself as having multiple personalities. Defendant claimed that she did not know if the baby was a boy or a girl, but described it as not normal. She said that it was not what her family would have wanted so she had to get rid of it. However, she now wanted to bury the baby next to her mother. She claimed that she was a good person who could do bad things and that she must be guilty of "dumping or whatever."

Defendant went to the Palatine police station on September 11, with her attorney, Michael Spievak. Three officers, including Roszak, were present for the interview. Defendant claimed that she had miscarried a 15-week-old fetus about the size of a navel orange. She discovered that she was pregnant by taking a home pregnancy test. She had not been to see any doctors, and she refused to explain why. Defendant claimed that King was in the room with her when the miscarriage happened. The police asked her if King wanted to call the paramedics, and defendant at first said "no," but then said that maybe he did. Defendant was questioned further about the size of the baby, and she indicated that it was roughly the size of her Gucci purse. Defendant began to tell her story about Dr. Levy finding numerous cysts or tumors, and one of the investigators told her that had spoken to Dr. Levy and that he said defendant was negative for cysts. Defendant denied that Levy told her this and said that Levy was going to perform a hysterectomy on her.

Defendant again said that she gave birth in the bedroom. She claimed that Steve held the plastic bag while she put the baby in it. Defendant claimed that she took the bag outside and put it next to her son's tree swing. The tree was rooted into the creek bank behind her house. Defendant claimed to not know how the bag

got into the creek; she did not hear a splash when she dropped it. Further, defendant did not think that the bag could have fallen into the creek because Steve saw it there the next day. Steve had told her that he would throw the bag away on his way to work, but he did not go to work for the next two days. When asked why she would put the bag near her children's play area, defendant responded, "I don't know." When asked if she threw the baby into the creek, defendant said, "No, but if you want me to say I did, then I did." Defendant asked if the baby could be buried next to her mother. The police then asked her why she wanted this if the baby was not hers. She responded that she had thrown the baby into the creek, but then recanted and said that she had only placed it next to the swing. Defendant then stated that she would claim the baby to "end all this," and that she wanted it buried next to her mother. Defendant told the police that she was going to tell King that another woman claimed the baby. One of the officers told her that the lies had to end. Defendant responded, "Whatever I tell him is my own business." Defendant denied that the baby had cried and claimed that it was dead, but when asked if King said that he heard the baby cry, defendant said, "I don't remember." Defendant was asked again if the baby cried, and she looked down at the table and said "no." Her attorney terminated the interview at this point.

Later that day, defendant called Roszak and asked to meet him in the park. Defendant told Roszak that she was not aware that a crime had occurred but that she must stop covering for Steve. Defendant then said that she did not hear a baby cry on the night of the delivery, but that "Steve probably might have heard a cry when he was throwing the bag away and that's probably why he is going crazy now." She said that when she came out of the bathroom, the baby was gone, and she never spoke to Steve about its whereabouts.

On September 12, defendant again contacted Roszak. She told him that she had just returned from visiting friends in Bloomington. Her friends had mentioned that it was the second anniversary of her mother's death so she decided to return home and check on her father. Defendant then said, "Tomorrow is my day of reasoning [*sic*]. I always thought I was like dad, but I'm not. I've got a conscience. It's eating me up. I'm at my breaking point but I've got to keep this family together."

The next day, defendant asked Sergeants Roszak and Koziol to meet her at her mother's grave. Defendant said that she could not have her kids taken away like last time. She offered to tell the police everything if the police could place her kids. She said that she wanted to clear her conscience and get everything off her chest. If the kids could be placed with Steve, defendant would tell the truth. Roszak said that they could not make such a promise, and the interview ended. Later that same day, defendant showed up at the Palatine police station claiming that she was ready to tell the truth. She claimed to have been covering up for Steve and going along with what he had to say. This time, defendant said that when she went to the bathroom, Steve cleaned up the bedroom and told her he was going to put "it" in the Dumpster on his way to work. Steve never went to work, and defendant did not know what happened to the baby. Ultimately, the police terminated the conversation, telling her that her story was filled with more inconsistencies than before and that it was pointless to continue.

Defendant argues that the evidence was insufficient for two reasons: (1) there was insufficient evidence that her baby daughter was born alive, and (2) even if the girl was born alive, there is no proof that she died as a result of a criminal act by the mother. Both of these arguments fail, as the circumstantial evidence was more than sufficient on both points. Surprisingly, the majority bases its

reversal on the second argument, easily the more preposterous of the two. The majority is willing to assume for the sake of argument that defendant's daughter was born alive. Thus, the sole question is whether any rational trier of fact could have found beyond a reasonable doubt that defendant killed her.

The majority seems to base its entire reversal on a curious critique of the medical examiner's testimony. The bitter irony here is that what troubles the majority about Dr. Kalelkar's conclusion is the precise problem with the majority's own analysis. The majority is actually troubled by the fact that Dr. Kalelkar considered the known facts of the case in reaching her conclusion that the baby drowned. Of course, the absence of such an analysis is the glaring flaw in the majority's own opinion. The majority focuses solely on the medical testimony involving the baby and fails to consider all of the other circumstantial evidence pointing directly to defendant's guilt.

Dr. Kalelkar is board certified in anatomic, clinical and forensic pathology. She has performed over 5,000 autopsies and has a special interest in pediatric deaths. She has lectured and published on the topics of drowning and asphyxia in infants. Dr. Kalelkar explained that when she issued her final death certificate listing homicide as the manner of death, she considered every fact found by her or supplied to her from August through December. Conspicuously absent from the majority opinion is Dr. Kalelkar's statement that this is standard practice in the field of forensic pathology and that it is the accepted way of doing things in her field. The defense tried to cast doubt on this statement through its experts. For instance, Dr. Pless testified that, with regard to the determination of cause of death, it is not a generally accepted practice among forensic pathologists to base their opinions on outside statements such as police reports. However, when

pressed on cross-examination, Dr. Pless stated that he *always* takes outside investigation evidence into consideration. He then explained that the outside information must coincide with what is found on the body. He also said that the analysis has to be developed from a scientific examination and not solely from witness testimony. The defense's other expert, Dr. Kirschner, testified that there is nothing unusual about waiting until all of the reports are in before making a final forensic determination. Moreover, he would consider the fact that a witness heard the baby cry, but that alone would not be a deciding factor. Here, the scientific evidence on the baby's body was consistent with what Dr. Kalelkar knew about the case. Thus, even under Dr. Pless' analysis, there was nothing wrong with Dr. Kalelkar's methods, a fact not taken into consideration by the majority when it decided to redetermine the witness credibility and substitute its judgment for that of the trier of fact.[5]

The medical evidence in this case was entirely consistent with live birth and drowning. Moreover, all that the defense was able to establish with its experts was that there are other ways a baby could die and that the evidence was also consistent with other causes of death. Of course, this is why all of the evidence in the case must be considered together. As I will demonstrate later, the evidence conclusively proved that the baby died as a result of the criminal agency of defendant. The

---

[5]In addition to its unwarranted critique of Dr. Kalelkar's findings, the majority appears to be trying to have things both ways. The majority focuses heavily on Dr. Kalelkar's testimony on whether the baby was born alive. But the majority concedes this point in the opinion. It cannot have it both ways. The majority has narrowed the issue to whether there was proof beyond a reasonable doubt of *corpus delicti*. It cannot bootstrap its conclusion on this issue with testimony on a different point that it has conceded to the State.

majority is troubled by the fact that King did not hear any subsequent cries and did not see the baby moving in the bag. Of course, he would not hear cries or see the baby move if defendant had already suffocated it. Importantly, Dr. Kalelkar testified that her findings were consistent with suffocation or drowning. She settled on drowning because the baby was found in the water. When Kalelkar was asked, "If the baby died of suffocation prior to being placed in the water, would there be any physical difference?" she responded, "No, there wouldn't be any physical difference." Defendant's experts agreed that the forensic evidence was also consistent with suffocation. As the majority notes, the *corpus delicti* of murder consists of the fact of death and that the death was produced by criminal agency. 211 Ill. 2d at 202. The State does not have to establish the means used to accomplish the death, and such an allegation in the charging instrument is formalism. *People v. Coleman*, 49 Ill. 2d 565, 571 (1971). Thus, given the overwhelming circumstantial evidence of defendant's guilt, King's testimony merely suggests that defendant might have killed her daughter before she took her outside. It does not require reversal of her conviction.

By focusing solely on what it perceives to be problems in the medical examiner's testimony and ignoring all of the other evidence in the case, the majority seems to imply that, to establish *corpus delicti*, a medical examiner must testify with 100% certainty that a criminal act caused the victim's death. Obviously, this has never been the rule. As the majority must know, the State is not even required to produce the victim's body to prove *corpus delicti. Campbell v. People*, 159 Ill. 9, 22-23 (1895); *People v. Faulkner*, 186 Ill. App. 3d 1013, 1026 (1989); *People v. Avery*, 88 Ill. App. 3d 771, 777 (1980). Obviously, in cases where the body is not recovered there can be no certain medical evidence as to the cause of death.

The rule is that proof of *corpus delicti* in homicide prosecutions may be by circumstantial evidence. *People v. Gendron*, 41 Ill. 2d 351, 360 (1968). Further, *corpus delicti* may be established despite the inconclusiveness of medical testimony as to the cause of death (see *People v. Milner*, 123 Ill. App. 3d 656, 662-63 (1984)), and *corpus delicti* does not need to be established by evidence independent of that which connects the defendant to the crime (*People v. Nachowicz*, 340 Ill. 480, 495 (1930); *People v. Aarhus*, 111 Ill. App. 2d 167, 176 (1969)). Thus, the majority is simply incorrect in its wild (and apparently serious) assertion that upholding defendant's conviction would require it to redraft the Magna Carta. Quite the contrary: a reinstatement of defendant's conviction would be compelled if the majority would simply apply our well-established case law on proof of *corpus delicti*.

The reason we must have a rule allowing proof of *corpus delicti* by circumstantial evidence is obvious. Common sense tells us that murderers, indeed criminals in general, tend to commit their crimes when no witnesses are around, and they do whatever they can to cover up the evidence of their crimes. A rule requiring reversals when the medical evidence cannot establish the cause of death to the exclusion of all other causes would simply reward those murderers who do the best job of destroying the bodies or hiding them until they are sufficiently decomposed to mask the cause of death. As far back as 1895, this court specifically held that it would not adopt the rule suggested by the majority opinion and that it would not let defendants play this game. *Campbell v. People*, 159 Ill. 9 (1895), is a case the majority would be wise to study.[6] *Campbell*, like the present case, was a prosecution for the murder of a newborn baby. However,

---

[6]The majority asserts that *Campbell* supports its position because it was a reversal. 211 Ill. 2d at 211 n.2. But the case was

the defendant was the baby's father. The baby's body was never recovered. Ultimately, this court reversed the defendant's conviction because the evidence showed that the mother had killed the child and was trying to place the blame on the defendant. What is important about that case, however, is that this court specifically rejected the defendant's *corpus delicti* argument because of its perverse implications. I quote from the opinion at length because I believe this court needs to reacquaint itself with these principles.

> "We are satisfied that the strict rule contended for by plaintiff in error has been modified by many authorities, and that the weight of authority now is that all of the elements of the *corpus delicti* may be proved by presumptive or circumstantial evidence. It was said by Jeremy Bentham, that 'were it not so, a murderer, to secure himself with impunity, would have no more to do but to consume or decompose the body by fire, by lime, or by any other of the known chemical *menstrua*, or to sink it in an unfathomable part of the sea.' (3 Smith on Judicial Evidence, 234.) In *King v. Burdett*, 4 Barn. & Ald. 95 (6 Eng. Com. L. 358,) BEST, J., said, in speaking of circumstantial evidence: 'Until it pleases Providence to give us means, beyond those our present facilities afford, of knowing things done in secret, we must act on presumptive proof or leave the worst crimes unpunished. I admit, where presumption is attempted to be received as to the *corpus delicti*, that it ought to be strong and cogent.' (See, also, Wills on Circumstantial Evidence.) In a copious note to *Rippey v. Miller*, 62 Am. Dec. 177, Freeman says: 'But while it is established that the death of the person whom it is charged the prisoner has killed may be proved by circumstantial evidence, it is everywhere held to be necessary to prove this fact by the most convincing evidence that the nature of the case will admit of. In *Smith v. Commonwealth*, 21 Gratt. 809, it was

---

reversed for the sole reason that the State had tried and convicted *the wrong parent.* What is important about *Campbell* is that this court went to great lengths to explain why it would not adopt the very *corpus delicti* rule that the majority champions today.

decided that the death of the person charged to have been murdered must be proved by the most cogent and irrefutable evidence.' And he there further says: 'To require the discovery of the body in every case would seriously interfere with the administration of justice. It is therefore clearly settled that the fact of death may be inferred from such strong and unequivocal circumstantial evidence as renders it morally certain and leaves no room for reasonable doubt.' (Ibid. note to p. 184.) See, also, to the same effect, *State v. Williams*, 7 Jones' Law (N.C.) 446, 78 Am. Dec. 248. In an elaborate note to this case, in which many cases are cited, at page 253 it is said: 'Direct and positive evidence is unnecessary to prove the *corpus delicti*. *** It may be proved by circumstantial evidence, if it be strong and cogent, and leave no room for reasonable doubt. *** This rule is now clearly established, and it would be unreasonable to always require direct and positive evidence. Crimes, especially those of the worst kind, are naturally committed at chosen times, in darkness and secrecy. Human tribunals must therefore act upon such indications as the circumstances of the case present or admit, or society must be broken up. The cases just cited show that the jury may find a verdict of guilty upon circumstantial evidence, and that the *corpus delicti* may be proved by such evidence, as well as any other part of the case, and that this rule applies in cases of murder and manslaughter as well as in all other crimes.' And at page 257 it is further said: 'But of the various forms of criminal homicide, that of infanticide (by which is popularly understood the murder of a recently born infant for the purpose of concealing its birth) perhaps presents the greatest difficulties in the establishment of the *corpus delicti*. No universal and invariable rule can be laid down with respect to it. Each case must depend upon its own peculiar circumstances, and, as in all other cases, the *corpus delicti* must be proved by the best evidence which is capable of being adduced, and such an amount and combination of relevant facts, whether direct or circumstantial, as

establish the imputed guilt to a moral certainty, and to the exclusion of every other reasonable hypothesis.'[7]

To this general statement of the law we assent. So strict a rule as contended for by plaintiff in error would, as pointed out by many authorities, operate, and especially in cases of infanticide, to completely shield the criminal from punishment for the most atrocious crimes. The complete destruction of the body of a newly born infant might not be difficult. To say that in such a case, while every one would admit that the body could be completely destroyed by animals, by fire, or other destructive agencies, circumstantial evidence, though of the most cogent and convincing character, would not be admissible to show the fact of death, as well as the criminal agency of the accused in producing it, would be to say that there is a class of the most atrocious crimes which, when committed in secret, as most crimes usually are, and by persons of sufficient capacity and skill to destroy the body, must go unpunished, because the law has closed all avenues but one leading to detection, and has permitted the criminal himself to close that one. We are not prepared to so hold." *Campbell*, 159 Ill. at 22-24.

Today's court appears to have forgotten the wise and sensible rule established in *Campbell*. The majority opinion shows that we will now indeed allow these atrocious crimes to go unpunished if the medical evidence cannot establish conclusively a death by criminal agency. The majority is apparently not in the least bit disturbed by the fact that much of the difficulty in arriving at a conclusive diagnosis in this case was the direct result of the mother's disposing of the body. This opinion is simply a blueprint on how to get away with murdering an infant. Suffocate an infant and throw its body in the water, or simply throw it in the water without killing it first, deny guilt, and you are home free. By not discussing any of the other evidence pointing irresistibly to defendant's

---

[7]Importantly, this court allowed proof of *corpus delicti* by circumstantial evidence even under the stricter reasonable hypothesis of innocence standard.

guilt, the majority is clearly saying that nothing matters except for the medical testimony. The majority is thus doing precisely what this court warned against in *Campbell*—closing all avenues but one leading to detection, and allowing the criminal to close that one. *Campbell*, 159 Ill. at 24. Curiously, the majority also seems to rely on the statement that "[n]o marks on the baby revealed foul play." 211 Ill. 2d at 205. I am unsure what significance the majority sees in this fact. A newborn baby found floating in the water is *itself* evidence of foul play, and the forensic evidence was consistent with both suffocation and drowning.

It should be obvious that any uncertainties in the medical examiner's testimony were merely what is to be expected when a body is found in water. Our last case in which a body was found partially submerged in water shows this to be true. In *People v. Milka*, 211 Ill. 2d 150 (2004), the murder victim, an 11-year-old girl, was found on a sandbar in the Kishwaukee River. As in the present case, the medical testimony was uncertain. The medical examiner concluded that the cause of death was homicide by asphyxiation. However, he conceded that he could not rule out the possibility that the victim had drowned. *Milka*, 211 Ill. 2d at 157. In reaching his conclusion of homicide, one of the facts that the examiner relied upon was that the victim was a young person found far from home in a secluded area. The defense's expert testified that the evidence was insufficient for a homicide determination and that the cause of death should have been listed as undetermined. His opinion was that the victim had drowned. *Milka*, 211 Ill. 2d at 157. Although he raised a sufficiency-of-the-evidence challenge, the defendant in *Milka* did not argue that *corpus delicti* had not been proved, nor did he complain about the medical examiner relying on outside investigation evidence. This is not surprising, as these arguments would have been

clear losers. Although the medical testimony could not establish with absolute certainty that the victim died of a homicide, that evidence combined with the circumstantial evidence was sufficient for a rational trier of fact to reach that conclusion. That is likewise the case here.[8]

If we rely on the medical examiner's testimony along with all of the other evidence in the case, instead of in isolation, the defendant's guilt is clear. The overwhelming circumstantial evidence points directly to the conclusion that defendant murdered her baby. If we view the evidence in the light most favorable to the prosecution, we can easily conclude that a rational trier of fact could have found defendant's guilt beyond a reasonable doubt. First, we have the fact that defendant already had two children. From this, a rational trier of fact could conclude that defendant would know what it felt like to be pregnant. Thus, we can assume that defendant knew she was pregnant. Any doubt on this point was cleared up by defendant's statement that she knew she was pregnant when she took a home pregnancy test. Further, defendant admitted that she was pregnant with John Stevens' baby and that she had sex with him in November of the previous year.

Next, we have defendant's pattern of behavior from April through August. During this time, defendant told countless lies and ridiculous stories in an attempt to prevent anyone from knowing that she was pregnant. Either defendant had a cancerous tumor, or she was carrying a baby that had already died. She made up doctor's appointments and lied about what doctors told her. Defendant sought no prenatal care and made no plans for raising a child. The majority completely ignores this

---

[8]The majority misses the point about *Milka*'s significance. It is cited here merely to show that some uncertainties in the medical examiner's testimony are to be expected when a body is found in water.

evidence, apparently believing that it is irrelevant. To see how relevant it is, we need only imagine if the opposite were true. Assume that defendant was excited about being pregnant, had sought prenatal care, told everyone she knew that she was pregnant, decorated a nursery, had a baby shower, and picked out a name for the child. Do we not know that if this were true that defendant would be making an argument like the following: "Why in the world would Elizabeth kill her baby? It makes no sense. The evidence shows that she was excited about this pregnancy and was telling everyone about it. She had picked out a name, bought baby furniture, and decorated a nursery. She never missed a doctor's appointment. And now the State expects us to believe that she would kill this baby that she was so excited about and invested so much time in? It just does not fit." The majority must know that defendant would have made this argument if those were the facts. And that would have been a perfectly valid and powerful argument. The opposite is necessarily also true. The absence of this behavior on defendant's part and her attempt to actively conceal the pregnancy is strong circumstantial evidence that she did not want anyone to know about this baby and that she never intended to raise it.

Next, we have defendant's behavior on the night of the birth. She made no plans for a midwife or for any family member to help her. King left the room when she began to deliver because he thought it was a miscarriage. Defendant did not ask him to stay. Again, we know from the evidence that defendant knew she was delivering a full-term baby, not miscarrying a partially developed fetus. We have to apply common sense here. What woman chooses to give birth in a room by herself? Women who choose home birth do not do so in a room with no one around. When defendant was screaming in pain, King said that he was calling the paramedics and defendant

told him not to. A rational trier of fact could conclude that defendant chose this path, which is contrary to human experience, because she was trying to cover something up.

Defendant's behavior after the birth also clearly shows her guilt. As noted, the evidence clearly showed that defendant knew she was delivering a full-term baby. The majority is willing to assume for the sake of argument that the baby was born alive, but claims that there was no evidence that defendant killed her—a stunning assertion given that defendant tied her in a plastic bag and placed her either next to or into a creek. What the majority must be saying under its new unreasonable hypothesis of innocence test is that perhaps the baby was born alive, and then immediately just happened to die, following which defendant immediately disposed of it in a creek. But is there any evidence that this happened? Again, we just have to apply common sense. What does a mother do who sees her newborn baby appear to die right in front of her? Does she shrug her shoulders and think to herself "I guess that's that," wrap the baby in a plastic bag, run out of the house in the middle of the night, throw the baby in a creek, and then lie about it? All while showing no emotion? Could any rational trier of fact think of a mother they have ever known who would act in such a way? This is just not normal human behavior. It defies all common sense that a mother would act like this. A trier of fact is allowed to consider the evidence in light of his or her own knowledge and observations in the affairs of life. *People v. Hobley*, 182 Ill. 2d 404, 465 (1998). Doesn't a reasonable mother who sees her baby appear to die right in front of her try to get help? Doesn't she do everything in her power to save the child? Here, if defendant's baby was born alive and just happened to die, defendant did nothing to try to help her or save her. If we accept that there are two possible explanations of

what happened that night—that the baby just happened to die or that defendant killed her—which one does the evidence support? The evidence points irresistibly to defendant's guilt. A rational trier of fact could conclude that her behavior was that of a mother who killed her baby, not that of a mother whose baby died in her arms immediately after birth.[9]

Moving on, we now have the defendant's ever-changing lies that she told the police. Prosecutors typically prove consciousness of guilt by introducing evidence that the accused: (1) tried to cover up the crime, or (2) attempted to deflect the investigation. See, *e.g.*, *Milka*, 211 Ill. 2d at 181 (false exculpatory statements are probative of consciousness of guilt)[10]; *People v. Gambony*, 402 Ill. 74, 80 (1948); *Avery*, 88 Ill. App. 3d at 777 ("Defendant also maintains there was no evidence other than the confession which proved a criminal agency. Defendant's false statements and actions following Tomika's disappearance could have been intended by defendant only to divert suspicion or postpone discovery of the crime. The evidence demonstrates criminal agency as well as the fact of death"). Here, we have both. Defendant tried to conceal the crime by disposing of the baby's body. She tried to deter the police investigation by telling them a series of lies. As set forth earlier in this dissent, defendant's stories to the police changed constantly, and she only gradually accepted some responsibility when she

---

[9]The majority puts itself in an interesting position by assuming for the sake of argument that the baby was born alive and then just happened to die, because not even defendant agrees with them that this is what happened. Of the many, many different stories defendant told about what happened that night, just about the only one she did *not* tell was the one that the majority invents for the sake of reversing her conviction.

[10]The majority ignores this portion of *Milka* when it holds that it is a "flaw" to equate a defendant's deceit with evidence of criminal agency. 211 Ill. 2d at 212.

knew that she was trapped. Several times she tried to put the blame on King; later she admitted that she was the one who disposed of the baby. Initially, she denied that the baby was hers. She claimed that she delivered a 15-week-old fetus, first saying that she disposed of it in the toilet, other times saying she threw it in the garbage, and later saying she put it next to the creek. She changed her story from the birth happening in the bathroom to the birth happening in the bedroom. At one point the baby was a glob of blood, later it was the size of a naval orange, and still later it was the size of a Gucci purse. Several times she claimed that whatever King had said was the truth. Some of her answers were simply preposterous. For instance, when the police asked her if she could have been seen by the creek that night, she said, "I don't know." How does a woman not know if she was outside by a creek shortly after giving birth? Another time, defendant said that before she could talk to the police, she needed to speak with King to find out what he told them. Why would an innocent person need to find out what the police already knew before she would speak to them?

Further, defendant showed her consciousness of guilt by making statements that only a guilty person would make. Only one of the statements that I'm about to discuss appears in the majority opinion, a matter that I find inexcusable. First, we have defendant's statements to June Powers. Defendant began a phone call to Powers by telling her that she was in "deep shit." In the same conversation, defendant said "what if the baby cried and Steve did do something?" and "what if they test the baby and the baby's mine? I'm going to jail." These statements are interesting for two reasons. First, a rational trier of fact could conclude that the one about the baby crying showed that defendant had some reason to believe that the baby might have cried and that the baby might

have been alive. No one who knew that the baby was stillborn would say, "What if the baby cried?" This is totally inconsistent with her other contemporaneous statements that she had delivered a 15-week-old dead fetus. Defendant made an even stronger statement in the same regard to Roszak when she said, "Steve probably might have heard a cry when he was throwing the bag away and that's probably why he is going crazy now." Now we have a *probability* that the baby might have cried—again a totally inconsistent statement from someone who had been insisting that the baby was dead. Next, the statements that she was in "deep shit" and was going to jail would allow a rational trier of fact to conclude that defendant was concerned that the police would discover that she had committed a crime. These statements seem to be those of someone who had done something much more serious than improperly disposing of a baby who died of natural causes.

In one of her conversations with Sergeant Roszak, defendant said that the baby was not what her family would have wanted so she had to get rid of it. What did defendant mean by this? Do any families want dead babies? Why would someone have to get rid of a dead baby because it was not what her family would have wanted? This statement implies something much more sinister. Next we have the following statement to Roszak which just reeks of guilt: "Tomorrow is my day of reasoning [*sic*]. I always thought I was like dad, but I'm not. I've got a conscience. It's eating me up. I'm at my breaking point but I've got to keep this family together." Is someone who has merely not given a proper burial to a child that died naturally so eaten up by her conscience that she worries about losing her family? Does such a person worry about having a day of reckoning? A rational trier of fact could conclude that this is the statement of someone who knows she has done something seriously wrong.

Finally, we have possibly defendant's most damning statement in which she offered to tell the police everything because she wanted to clear her conscience and get everything off her chest. She said that if her kids could be placed with King, she would tell the police the truth. The police could not make that promise, and that particular interview ended. This is a telling statement for several reasons. First, defendant admits that she has not been telling the truth. Whatever that truth is, it is weighing on her and bothering her conscience. Up to this point, defendant had finally told the police that she delivered a dead baby and placed it by the creek. But the truth was something else, something that was weighing at her conscience. Finally, her willingness to tell this truth was contingent on the police agreeing to place her kids with King. So whatever the truth was, it was something so serious that defendant knew she would lose her kids over it, and that King would not be implicated. How does the majority not discuss this statement? Any one of the above statements that the majority neglects would be powerful circumstantial evidence of guilt, but taken together they comprise overwhelming evidence of guilt. A rational trier of fact could conclude that defendant continually acted like a guilty person and made statements that only a guilty person would make.

When all of the above evidence is considered with Dr. Kalelkar's testimony, no reasonable doubt of defendant's guilt remains. The majority states that this court will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt. 211 Ill. 2d at 210. Are my colleagues honestly saying that the above evidence is so *unreasonable, improbable and unsatisfactory* that *no* rational trier of fact could find defendant's guilt beyond a reasonable doubt? The only things unreasonable, improbable, or unsatisfactory in this case

are defendant's arguments. Interestingly, the majority is willing to concede that the evidence is sufficient to convince it that defendant is probably guilty (211 Ill. 2d at 213), which would seem to place this case in a strange gray area. On the one hand, the majority states that the evidence is sufficient to convince it that defendant is probably guilty. On the other hand, the majority holds that the evidence is so unreasonable, improbable, and unsatisfactory that *no* rational trier of fact could be convinced of defendant's guilt beyond a reasonable doubt. This would appear to be a classic example of a court reweighing the evidence and substituting its judgment for that of the trier of fact.

The majority cites *People v. Martin*, 26 Ill. 2d 547 (1963), for the proposition that the link between the defendant's criminal agency and the cause of death cannot be left to inference and speculation. 211 Ill. 2d at 210. This is a patently false statement, at least with respect to inferences. Inferences are the lifeblood of the criminal law. It could not survive without them. The following passage from Cleary and Graham's Handbook of Illinois Evidence demonstrates the necessity of inference in the criminal law:

"Evidence may be either direct or circumstantial. [Citation.] Direct evidence is evidence where the sole *inference* that must be made to establish a fact of consequence is the truth of the matter asserted. Testimony such as 'I saw X shoot B,' is direct evidence as to a fact of consequence. Circumstantial evidence involves evidence offered to establish a fact of consequence where an *inference* in addition to the truth of the matter stated needs to be made. [Citations.] Thus evidence that X fled the scene would be circumstantial evidence of the murderous act. [Citation.] [C]ircumstantial evidence is proof of certain facts from which a jury may *infer* other connected facts that reasonably follow according to the common experience of mankind. The *inference* to be drawn need not be the only conclusion logically to be drawn; it suffices that the sug-

gested *inference* may reasonably be drawn therefrom. [Citation.]'' (Emphases added.) M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 401.1, at 141-42 (7th ed. 1999).

Thus, *all* criminal convictions, whether based on direct or circumstantial evidence, are based on inference. Moreover, as explained earlier in this dissent, *every* part of a criminal case, including *corpus delicti*, may be established by circumstantial evidence. In other words, every part of a criminal case may be based on inferences beyond the truth of the matter asserted. *Milka* is a recent example of a case in which this court upheld the defendant's conviction based entirely on inferences. It is simply a misstatement of the law to say that the link between criminal agency and cause of death cannot be left to inference. Here, the inferences that can be drawn from the totality of the evidence in this case are indeed ones that reasonably follow according to the common experience of mankind and they are powerful evidence of guilt.

In an article in the Fordham Law Review, authors Christine Fazio and Jennifer Comito argue that teenage mothers who kill their babies should receive lesser sentences than other murderers. See C. Fazio & J. Comito, *Rethinking the Tough Sentencing of Teenage Neonaticide Offenders in The United States*, 67 Fordham L. Rev. 3109 (1999). Although I disagree with this conclusion, I find interesting the authors' description of the typical fact pattern that is seen when young mothers kill their babies. The mother does not tell her family she is pregnant, and she does not give birth in a hospital. She receives no prenatal care and does not plan for the birth. When the birthing day arrives, the young mother kills the baby either by suffocation or stabbing, leaves it in a toilet to drown, or abandons the baby where it dies of exposure. The mother then covers up what she did, typically by leaving the baby outdoors or in the trash. *Re-*

*thinking the Tough Sentencing*, 67 Fordham L. Rev. at 3109-10. Thus, the irony of the majority's opinion is that we have now held that facts showing a textbook case of infanticide are at the same time so unreasonable, improbable, and unsatisfactory that they could convince no rational trier of fact of the defendant's guilt. The majority is simply mistaken when it states that its holding is "as unique as its facts, and is limited to them." 211 Ill. 2d at 215. I believe that these facts are not unique but are typical in infanticide cases, and the majority's opinion will make it virtually impossible for the State to obtain convictions in these cases.

Curiously, the majority opinion ends by relying on out-of-state cases. I am unsure why the majority ignores our own case law and favors out-of-state cases instead. As noted above, the majority opinion fails to apply the rule we established in *Campbell*. Further, the majority fails to mention that one of its cases, *State v. Doyle*, 205 Neb. 234, 287 N.W.2d 59 (1980), included a forceful dissent from two justices who criticized the majority for making the same mistakes as our majority does. *Doyle*, 205 Neb. at 241-49, 287 N.W.2d at 64-67 (Clinton, J., dissenting, joined by Boslaugh, J.). Specifically, the dissenting justices pointed out that the prosecution is entitled to rely on circumstantial evidence to show that death was a result of the criminal agency of the defendant. *Doyle*, 205 Neb. at 245, 287 N.W.2d at 66 (Clinton, J., dissenting, joined by Boslaugh, J.). In support, the dissent relied on this court's decision in *People v. Ryan*, 9 Ill. 2d 467 (1956). To say the least, I find it strange that my colleagues would rely on the majority opinion in an out-of-state case when the dissent in that case is premised on the argument that the majority should have followed Illinois law.

In *Ryan*, the defendant mother was charged with murder and manslaughter in the death of her newborn

baby. She was convicted of involuntary manslaughter. The evidence showed that the defendant was pregnant with a baby out of wedlock. She gave birth to the baby alone in the bathroom. When the baby was born, the defendant tied off and cut the umbilical cord. She then baptized the baby with water from the faucet, wrapped it in the beach towel upon which she had given birth, and then locked it in an overnight case. She disposed of all of the evidence except for the overnight case. The next day, she took the baby out of the case and buried it in a shallow grave. The defendant's position was that the baby, even if born alive, was dead of natural causes before she wrapped it in the towel and put it in the overnight case. Defendant argued that *corpus delicti* had not been established because the evidence did not show death by the criminal agency of the defendant. This court rejected defendant's argument that *corpus delicti* was not established beyond a reasonable doubt, noting that *corpus delicti* may be proved by circumstantial evidence. *Ryan*, 9 Ill. 2d at 471. After concluding that the circumstantial evidence was sufficient to show that the baby was born alive, this court took up defendant's argument that the State failed to prove death by criminal agency:

"In support of her second contention that the State failed to prove that the child came to its death by other than natural causes, defendant relies particularly on her own testimony and the fact that the pathologist did not and was not asked if he was able to ascertain medically as to what was the cause of death. The defendant, in testifying in her own behalf, said she made no effort to ascertain whether the baby was alive or dead, but that when she wrapped it in the beach towel she believed it was dead. In her second signed statement she said, 'I made no effort to keep it alive and was not sure when I wrapped it in the towel whether it had died or was still breathing.' Yet the defendant wrapped the infant in the beach towel and placed it in a closed and locked overnight case.

There is no doubt that the infant was wrapped in a

beach towel, and it is common knowledge that death by suffocation could have resulted from this act before the child was placed in the overnight bag. It is likewise common knowledge that the act of placing the infant in the overnight case and locking it in there would also be sufficient to cause death." *Ryan*, 9 Ill. 2d at 475.

Thus, we have specifically held that in an infanticide case *corpus delicti* may be established by the mother's behavior even in the complete absence of a medical examiner's opinion as to the cause of death. The majority's decision to ignore this case while relying on out-of-state cases that follow a different rule is completely inexplicable.

The majority casually dismisses *Ryan* as an involuntary manslaughter case. That, however, merely brings up another question, and that is why the majority never considers reducing defendant's conviction to involuntary manslaughter before simply affirming the appellate court's outright reversal. The parties argued the involuntary manslaughter issue to the trial court, but the court found that defendant was guilty of murder. The appellate court did not consider the involuntary manslaughter issue because it reversed on the basis of insufficient evidence to prove live birth. But the majority is willing to assume that the baby was born alive. If that is the case, then the majority has to take up the involuntary manslaughter issue. Section 9—3(a) of the Criminal Code of 1961 (720 ILCS 5/9—3(a) (West 2002)) provides, in relevant part, as follows:

"A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***."

In *Ryan*, we stated that, "[r]egardless of defendant's real belief, or the absence of actual malice, the reckless and wanton disregard for the welfare, safety and life of

her infant daughter constitutes criminal neglect" which was cognizable as involuntary manslaughter. *Ryan*, 9 Ill. 2d at 475. Here, even if defendant believed that her child died naturally, she had a duty to make sure that that was in fact the case and she had a duty to provide her with assistance. Section 4—1 of the Code provides that "[a] material element of every offense is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing." 720 ILCS 5/4—1 (West 2002). There is no question that the common law imposed a duty upon defendant to attempt to aid her child. See 1 W. LaFave, Substantive Criminal Law § 6.2(a)(1), at 437 (2d ed. 2003) ("The common law imposes affirmative duties upon persons standing in certain personal relationships to other persons—upon parents to aid their small children, upon husbands to aid their wives, upon ship captains to aid their crews, upon masters to aid their servants. Thus a parent may be guilty of criminal homicide for failure to call a doctor for his sick child"). A parent who sees her newborn infant in distress is under a duty to provide assistance and may not immediately wrap up the baby and throw it away. *Ryan*, 9 Ill. 2d at 475. In my opinion, the evidence clearly supports murder, not manslaughter, and I would dissent from a decision reducing defendant's conviction. Nevertheless, the majority must consider this issue.

The most disingenuous statement in the majority opinion is the quote from *People v. Smith*, 185 Ill. 2d 532, 545 (1999), that "[w]hat is involved here is the standard of proof which is applicable to all crimes." I have never seen the prosecution held to the standard of proof that the majority holds the State to in this case, nor have I ever seen a sufficiency-of-the-evidence appeal reviewed in this manner. The majority leaves crucial evidence out of the opinion, refuses to review the evidence in its totality,

ignores our established case law, creates a new rule for proving *corpus delicti*, and rewards defendant for covering up the crime. Is this really to be the standard applicable to all cases? We know for certain that it will be for infanticide cases. If the victim is a newborn baby and the defendant is the baby's mother, we will hold the State to a completely different standard and will not review the evidence in the way we would in any other case. There is one standard for mothers who kill their babies and another one for everyone else. But perhaps my colleagues should pause and ask why this is so. What is it about the fact that the victim in this case was a newborn infant that causes them to treat her case with such casual indifference that they cannot even be bothered to review all of the evidence? Is it not the least among us who deserves the greatest protection? Although her life was tragically cut short, this newborn baby girl is forever a part of the human family, and her life is no less valuable than that of even the oldest and wisest among us. She was entitled to life, and she is entitled to justice.

I dissent.

JUSTICE GARMAN joins in this dissent.

JUSTICE KILBRIDE, also dissenting:

I respectfully dissent from the majority's opinion. As framed by the majority, this case presents the issue of the sufficiency of the evidence to affirm defendant's conviction. See 211 Ill. 2d at 201-02, 215. We need only decide whether any rational trier of fact could have found defendant's guilt beyond a reasonable doubt. 211 Ill. 2d at 202, citing *People v. Brown*, 185 Ill. 2d 229, 247 (1998). After reviewing the evidence presented in the circuit court, considering the briefs of the parties, and reviewing the evidence in the light most favorable to the prosecution (*Brown*, 185 Ill. 2d at 247), I do not find the evidence so improbable or unsatisfactory no rational trier of fact

could have found the defendant guilty beyond a reasonable doubt. *People v. Tenney*, 205 Ill. 2d 411, 427 (2002). Accordingly, I must respectfully dissent.