2020 IL App (2d) 170284-U
No. 2-17-0284
Order filed March 23, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-1506 |
| RICHARD SCHMELZER, | ) ) | Honorable Linda Abrahamson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence was sufficient to sustain defendant's first-degree murder conviction. Affirmed.

¶ 2    On July 18, 2014, Mildred Darrington, age 85, was found dead at home with a stab wound in her neck. A jury ultimately found defendant, Richard Schmelzer (her grandson), guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2012)). The court sentenced defendant to 45 years' imprisonment and denied his post-trial motion. In this direct appeal, defendant challenges only the sufficiency of the evidence that gave rise to his conviction. We affirm.

¶ 3                                I. BACKGROUND

¶ 4     At trial, the State presented approximately 54 witnesses.  In sum, the State's theory was that, for financial gain, defendant drove from his home in Texas to Illinois on July 17-18, 2014, murdered Darrington, and immediately returned to Texas.  Defendant did not testify or present witnesses, but he argued, as he does on appeal, that the State's case contained insufficient circumstantial evidence to establish his guilt, that the case against him resulted from a rush to judgment and a failure to investigate other suspects, and that the overall narrative "essentially amounted to character assassination."  We summarize the pertinent evidence.

¶ 5          A. General Background, Cause of Death, and Crime Scene

¶ 6     In 2014, defendant lived in Frisco, Texas, with his wife, Jennifer, and four daughters.  He was employed as an athletic trainer for a local high school, although prior thereto he was employed in a financial field.  He was originally from Illinois, and his mother, Angela Schmelzer, adoptive father, Fritz Schmelzer, sister, Kimberly Schmelzer, and Darrington continued to live in West Dundee, St. Charles, and East Dundee, respectively.  Defendant's biological father, Richard Harris, lived in Arizona.  It is apparently undisputed that defendant was Darrington's "favorite," and they enjoyed a special, close relationship.  According to Kimberly, defendant would sometimes come to Illinois in the middle of the night to stay with Darrington, and he and his family had visited Darrington on occasions kept secret from Angela.

¶ 7     On Thursday, July 17, 2014, at 7:53 p.m., Darrington left a voicemail on a neighbor's answering machine, thanking the neighbor's son for mowing her lawn.  The son explained that Darrington wanted her lawn mowed, because she had family coming in from out of town and that, while there, he saw a roofer working on the house.

¶ 8     On July18, 2014, however, Darrington did not arrive at her weekly 9 a.m. hair appointment, and her longtime hairdresser, Sylvia Poloway, went to her home in East Dundee to check on her.

The hairdresser entered the attached garage through a rear personal entry door, which was slightly ajar, then entered the home through an unlocked door in the garage. She found Darrington in her bed, with blankets covering most of her body and a pillow covering her face. Darrington was motionless and not breathing. Poloway called the police around 9:30 a.m.

¶ 9    Police and paramedics arrived. When the paramedics removed the pillow covering Darrington's head and the blankets that covered her body, including her nose and mouth, they noticed a trail of blood on the comforter and sheet. Darrington had a large amount of blood and traumatic injuries around her neck, signs of *rigor mortis*, and pooling blood, which indicated that her blood had settled after resting in the body. The blood was contained to the bedding; no blood was on the headboard, walls, or floor.

¶ 10    The home showed no signs of forced entry. There was, however, a small shard of wood, around 2.5 inches long, missing from the personal entry door near the strike plate and was found on the garage floor, but the strike plate itself showed ordinary wear and there were no pry marks on the edge of the door signaling a forced entry. Numerous people, including Angela, Kimberly, defendant, and neighbors had a key to Darrington's house, and a spare key was kept in an electrical box behind her house. There were undisturbed cobwebs behind the key in that box, but not in front of it. The box, light switches, and garage keypad were not processed for fingerprints. Of the items that were tested, no fingerprints suitable for comparison were recovered. The house was clean, neat, and its contents undisturbed. The home contained $2500 in cash, $1600 in gift cards, jewelry, and Darrington's purse, wallet, and credit card. Knives in the home were inventoried, but nothing indicated that they were involved in the stabbing. Reports were made that a blonde female in athletic clothing was seen running through yards in the neighborhood, and two people were seen

in Darrington's backyard two weeks before the incident, but police were unconcerned with these reports, as Darrington's house was across the street from a park frequented by joggers.

¶ 11    On July 19, 2014, Dr. Mitra Kalelkar performed an autopsy, noting that Darrington had on the left side of her neck: (1) a small, superficial 1-inch incised wound; and (2) a 3-inch long stab wound that went 2.5 inches deep into the neck, ending at the spine and severing her left jugular vein.  The deep stab wound had "sharp" lines, wavy only due to wrinkled skin that was not pulled taut during the event, and it was inflicted with a sharp instrument used with "considerable force." This was a homicidal, not self-inflicted, injury.  Darrington also had a bruise under her right eye, one on the back of her right hand, and another on the left side of her chin.  The bruises were fresh, and the facial bruises could have been caused by downward pressure being placed on her face by a pillow or hand; the bruise on her hand would be caused by pressure or hitting something.  She acknowledged that Darrington had a chip in her left thumbnail, but testified that it appeared to be an old injury.  Although, on July 18, Jennifer had received a text from Kimberly stating that there were signs of possible sexual assault, Kalelkar testified that there were no signs of sexual assault. Darrington's stomach was empty, meaning that she had not eaten for at least three hours or more before her death.  The cause of death was hemorrhage due to the deep stab wound in the neck.  The State showed Kalelkar a knife (a Recon 1 knife found in defendant's home) and asked whether it could have caused Darrington's stab wounds.  She answered yes, because it was sharp and the stab wounds were made by a sharp instrument.  The State inquired whether the size of the knife was significant, and she answered, "the size perfectly fits the wound also."

¶ 12    On cross-examination, Kalelkar clarified that she did not cast the wound or have the knife with her when she performed the autopsy, so when she said that the knife perfectly fit the wound, she meant only that the knife could have perfectly caused the injury.  She agreed that the State did

not show her any other knives, and she stated that there were no knives found at the residence. Kalelkar gave police various items, including scrapings from under Darrington's fingernails; the bloody clothes Darrington was wearing; pulled and combed head hair; oral, rectal and vaginal swabs; and paper bags that covered her hands to preserve evidence. She reiterated, however, that the examination of Darrington's hands and fingernails showed them to be clean, there were no signs of sexual assault, and her clothes had not been disturbed.

¶ 13    Blake Aper, a forensic scientist, testified that he did not analyze the fingernail scrapings, swabs, hair samples, or bedding, because he was told that there were no signs of struggle at the scene or likelihood that a sexual assault was involved. Aper was not told that Darrington had fresh bruises, consistent with something being pushed down on her face, nor a broken thumbnail. Had he known those facts, and to err on the side of caution, he would have made different decisions about what to analyze.

¶ 14    A Recon 1 knife was found in a duffel bag in defendant's house. Both tested negative for the presence of blood. The knife had a Caucasian human head hair on it, which was tested, but there was insufficient DNA for suitable comparison.

¶ 15                                    B. Police Interviews

¶ 16    On July 18, police interviewed Angela and Fritz at their home (officers explained that Fritz has significant health issues). The interview was recorded, but not videotaped. Angela lived 10 minutes away from Darrington's house. Angela denied harming Darrington or being at Darrington's house during the relevant period. In her interview, Angela said, among other things, that she loved defendant, but did not like him anymore. She explained that she did not trust him, believed him to be a liar, and that, while at one point she did not think he could have harmed her mother, she was not sure anymore. Angela explained that she and defendant were co-executors of

Darrington's will. Angela was due to inherit a lump sum of $50,000, with Kimberly and defendant splitting most of the remainder of the estate. Investigators verified Angela's whereabouts around the time of the incident.

¶ 17    On July 19, although she lived in St. Charles, police interviewed Kimberly at the East Dundee police station. The interview was recorded, but not videotaped. The station did not have a dedicated interview room or built-in video-recording equipment. In her interview, among other things, Kimberly said that the first thing that came to mind was that her brother might be responsible and that she felt sick. She said that, when she recently visited Texas, defendant talked with her about money problems, that he had once set fire to his house, that he "always" went to Darrington for money, and that he got angry with her whenever she discussed the money he accepted. Police verified Kimberly's whereabouts around the time of the incident; however, they did not speak with her employer or co-workers regarding her whereabouts the morning of July 18.

¶ 18    Police were aware that defendant arrived in Illinois on July 21, but they did not interview him until July 24. Specifically, Darrington's funeral was held on July 23. Lead investigator Daniel Duda and Detective Brian Polkinghorn attended the funeral to watch for anything unusual, and they parked outside the restaurant where a luncheon was held post-burial. They wanted to speak with defendant and Jennifer before they left Illinois, and they followed defendant after the luncheon to a house in St. Charles to determine where he was staying. Duda then called defendant, using hands-free technology and so that Polkinghorn could hear both sides of the conversation. Duda asked if defendant and Jennifer would come in for an interview. Defendant replied that he planned to speak with Duda around 1 p.m. the next day. Duda suggested that they meet at the South Elgin police department, because the location was closer to the home where defendant was staying in St. Charles and it was more conducive to conducting interviews.

¶ 19    Defendant and Jennifer arrived at the police station and Jennifer was interviewed first. Detectives Duda and Polkinghorn next spoke to defendant, in an audio- and video-recorded interview room. They discussed that defendant was co-executor of Darrington's estate and that, while he claimed that he did not know dollar amounts, he stated that he knew she had an annuity, life insurance, and stocks. Defendant claimed that his marriage had good and bad "spots," with the bad spots resulting from lack of time together due to the children's busy schedules. He agreed they employed a nanny that worked 40 to 50 hours per week. Defendant denied that he had ever had an affair, drug problem, or gambling problem.

¶ 20    As to his personal finances, defendant explained that Jennifer earned around $190,000-$197,000 annually, while he earned $70,000. He handled their finances, denied that money was often "tight," and said they were doing "fine" financially. Defendant explained that, while he and Jennifer used to have credit-card debt, they paid it off and no longer used credit cards; rather, they always paid in cash and saved for things. He stated that they paid around $530,000 for their current house, claiming that they put down 20% as a down payment (although it appears that they took out a second mortgage to make the 20% down payment and actually had no equity in the house at purchase) and had a $3200 monthly mortgage payment. Defendant explained that they took out a $45,000 second mortgage to put in a pool and fence. He explained that there was a lawsuit pending against their mortgagee, because when, in 2010, they applied for refinancing for being "upside down" on their mortgage, the mortgagee attempted foreclosure and "falsely" claimed that they had not been making mortgage payments. Defendant estimated that they had $2000 in savings and a total of $1500 in three checking accounts, but denied that they lived "check to check." He noted that they had just spent around $5000 on home repairs, and he expected that their savings would soon be replenished with anticipated bonuses. Defendant drives a BMW. He also explained that

Darrington sometimes sent him money, in large amounts, because she wanted to and that was "just the way grandma was." He recalled that he received from her $100 on July 18 (initially he said it was via check, but later via money order); she had sent him $1500 once when he was having a "rough week," (initially he said it was via check, but later said it had been transferred from her credit card using Square, an application for electronic credit-card processing).

¶ 21    The detectives ultimately asked defendant to account for his movements on July 17-19, 2014. Defendant testified that, during those dates, there was a large continuing-education conference held in Frisco that was relevant to his job as a physical therapist and athletic trainer. He attended the conference while Jennifer and the kids were in Montana, visiting some of Jennifer's family. According to defendant, he arrived at the conference on Thursday, July 17, at around 8 a.m. and left around 6 p.m. He then dined at the Capital Bar and Grille, which he regularly frequented and was usually served by "Ryan." He volunteered to the officers that he had lamb chops, two drinks, and paid around $50 in cash, reiterating that he never used credit cards. Further, defendant offered to provide the officers with his receipt, which he had on his person during the interview. They accepted his offer, and he handed the receipt to them.

¶ 22    Defendant asserted that, after dinner on July 17, he went home to bed and woke late the next morning, Friday, July 18. Because he was running late, he forgot his phone at home when he went to the conference. Defendant stated that he ate lunch that afternoon at Jason's Deli with a colleague named Ed Hunt. When he got home and checked his phone, it had numerous texts and phone messages from family concerning Darrington's death. According to defendant, when he called Angela, she told him that Darrington had been "smothered and sexually assaulted" and there was blood, and that she later told him that Darrington's left jugular vein was cut. He also reported having read news reports saying she was stabbed.

¶ 23    Next, defendant told officers that, on Saturday, July 19, he checked in at the conference around 8:30-9:00 a.m.; the only day which included a check-in, the check-in was to be performed by completion of a test. The test, which was supposed to be completed online, "didn't take," so defendant also took it on paper.[1]  After the conference, he went to a gun range with his assistant and her husband and they dined at Capital Grille. He said he paid around $120 in cash for his portion, but then said it was "comp'ed" by Ryan, the bartender who normally served him, so, in fact, he tipped Ryan $120.

¶ 24    Police challenged some apparent discrepancies in defendant's statement, including, for example, whether he had an American Express card. Defendant responded, "No. Like I said, we don't carry plastic." Duda pointed out that the Capital Grille receipt defendant had produced (time stamped 10:08 p.m. and reflecting that he was served by Melissa Balbuena) showed that he paid $50.47 on an American Express card. Defendant thought it might be the wrong receipt, but Duda confirmed that it was for the lamp chops and two drinks that defendant said he had ordered. Defendant responded that he did not look at the bill, was "comp'ed" that night, and that the receipt included "part of what *we* had," (emphasis added), even though he allegedly dined alone. Duda

---

[1] Later evidence revealed that the test was supposed to be completed by 9:30 a.m., but a report from the survey system showed that defendant did not begin the pretest until 9:39 a.m. Of the 400 attendees, defendant was the only one who took both an electronic and paper test. The program chair testified, had defendant "been at the conference earlier, he would have received multiple e-blasts and instructions that were continually repeated at the beginning of each other session in terms of what individuals were to do."

responded that, if defendant were comp'ed and the $50.47 was paid instead as a tip, it did not make sense that he was charged tax.

¶ 25     Officers reached out to the Capital Grille employees, who stated that defendant had not been there on July 17. Defendant was *Mirandized*, invoked his right to counsel, was detained, and then released.

¶ 26                    C. Follow-Up Investigation and Relevant Trial Evidence

¶ 27     The Capital Grille employees knew defendant as a regular customer; again, they stated that they did not see defendant on July 17, he was not served by Balbuena that night, and, further, the July 17 receipt (for lamp chops and scotch) was inconsistent with defendant's normal order of fruity cocktails, wine, and steak. The employees *did* see defendant seated at the bar, in his usual spot, with two colleagues on Saturday, July 19. Defendant appeared haggard and distressed, and an employee asked if he was alright. Defendant responded that there had been a death in his family. That night, he also requested a "cash receipt" from Thursday, July 17. Defendant was referred to a manager, who was busy, and, so, she printed a random receipt and gave it to defendant. Around midnight, however, defendant tried calling the manager and left a voicemail asking that she return his call; she did not do so. Then, on Sunday, July 20 at around 4 p.m., he showed up at the restaurant and asked instead for a receipt in the $50-range from Thursday. The manager printed a receipt in that range, assuming that he needed it for a business expense. The manager testified that defendant never asked her to produce the receipt for the items he ordered or for a receipt reflecting cash payment; rather, he was adamant that it be a receipt in the $50-range.

¶ 28     The athletic-trainer conference was held at a hotel and convention center, but there were no surveillance cameras in the public areas of the facility. Ed Hunt attended the conference and saw defendant there between 9:30 and 11 a.m. on Thursday morning, but he did not see defendant

again on July 17 or July 18. However, defendant called Hunt at 8:45 p.m. on Friday, July 18, and asked Hunt to send him an email stating that they met for lunch that day. Although Hunt did not eat lunch with defendant at Jason's Deli on July 18, he assumed that defendant might be seeking reimbursement for a business expense and sent defendant the requested email.

¶ 29    One of defendant's colleagues saw defendant at the conference the morning of July 17; she did not see him again there until after the first lecture on Saturday, July 19. However, she agreed that he may have attended different lectures.

¶ 30    On July 16, defendant went to an AT&T store in Frisco and purchased a pre-paid GoPhone. The employee who sold it to him said defendant told her that his name was "Joe Smith" and that he wanted a "cheap, untraceable" phone, because he was traveling "cross country" and needed it only for GPS. He did not want to provide a full address for activation. The phone was activated with the number (469) 416-2729 and was traceable via GPS and cell towers "pinging," but not traceable in the sense that no social security number was required for activation. Also on July 16, around 2:15 p.m., defendant purchased a prepaid American Express gift card and funded it with $260 in cash.

¶ 31    John Daloise, one of defendant's close friends, testified that, in July 2014, defendant asked if he could borrow one of Daloise's company's trucks or vans. When Daloise said that there were none available, defendant asked Daloise if he would rent a car for him, specifically one with good gas mileage and unlimited miles. Daloise asked why defendant could not rent one himself, and defendant explained that he wanted to move some things without Jennifer knowing. Defendant also asked Daloise to put the rental car in Daloise's name. At 10:09 p.m. on July 16, 2014, Daloise texted defendant to inform him that he had not yet heard back from the rental agency. Defendant responded the next morning, informing Daloise that he no longer needed the car. Later, after

Darrington's funeral, defendant told Daloise that he was a suspect in the murder. When Daloise asked defendant why and whether he did it, defendant responded that he could not talk about it.

¶ 32    After trying to obtain a car from Daloise, defendant called Kevin Kratz, his cousin by marriage on his father's side. Defendant asked Kratz to rent a car for him so that he could travel to Arizona to speak with his father about the possibility of divorce. As background, Kratz had accompanied defendant on a trip to Las Vegas in June 2014, where defendant tried to collect money from a female. Defendant expressed on that trip that his relationship with Jennifer was declining and that he was thinking about getting a girlfriend. Kratz also knew that Jennifer and the kids were in Montana, so he agreed to rent the car from Enterprise Rent-A-Car in Addison, Texas. Around 10 a.m. on July 17, defendant picked up Kratz, a pharmacist, at the medical center where he worked and then drove to the Enterprise. Kratz provided his name, license, phone number, and credit card to secure the car, while defendant provided an address and phone number that Kratz did not recognize, but believed to be connected to a pre-paid phone. They rented a gray, four-door, Ford Focus with a Texas license plate and 21,609 miles on the odometer. Kratz drove the rental car off the lot, and they switched cars in a restaurant parking lot. Defendant left his iPhone in his BMW that Kratz was now driving and gave Kratz a new phone number by which to reach him. Defendant left with the rental car at 11 a.m. on July 17. Kratz returned to work.

¶ 33    Over the next two days, defendant contacted Kratz by a phone number with a (469) area code. On Thursday afternoon, defendant asked Kratz to turn off defendant's iPhone and, on Thursday evening, asked Kratz to turn on the iPhone again and to place it in the cabinet on the back patio of defendant's house, which he did. The next day, July 18, Kratz went to work and defendant called him throughout the day to give him travel updates, at one point mentioning Albuquerque, which made sense because Kratz thought defendant was going to Arizona.

¶ 34    Kratz next saw defendant the evening of July 18.  It was too late to return the rental car, so Kratz drove the BMW to defendant's house.  As payment towards the rental car, defendant gave Kratz $60 in cash and a prepaid American Express gift card that he said had $100 left on it.  Kratz accepted those, but declined defendant's offer to also take the prepaid cell phone that defendant had been using.  Defendant told Kratz that he had *not* gone to Arizona, but had instead traveled to Illinois and visited a "friend at a park."  He told Kratz that his grandmother had been fatally stabbed.  The news left Kratz shocked and scared.  When Kratz later went online to verify the amount of money remaining on the prepaid American Express card, the transaction history showed that the card had been used "to and from Dundee, Illinois."  He was afraid, because the card had been rented in his name, the gift card in his possession showed purchases to and from Dundee, and a person in Dundee was dead.  Afraid, Kratz destroyed the three-digit code on the back of the card.

¶ 35    The transaction history for the American Express gift card reflected that the card was used to make purchases: (1) on July 17, at 5:44 p.m., in Oklahoma, and at 11 p.m., in Collinsville, Illinois; and (2) on July 18 at 3:13 a.m. in West Dundee, Illinois (less than three miles from Angela's house), at 10:13 a.m., in Missouri, and at 2:26 p.m., in Oklahoma.  Surveillance videos showed a man that Kratz and Jennifer testified looked to be defendant at the Missouri stop, while other videos and an Illinois Tollway violation photo showed the Ford Focus rental car.

¶ 36    Cell records of defendant's iPhone and a GoPhone with the (469) area code were introduced.  For each communication or use of data, the phone connects to a cell site or tower and records reflect the longitude and latitude of the cell site or tower used.  As a phone user travels between states, the phone hits different towers, and each tower generates a record.   The records reflect that the GoPhone was in use from July 17 at 11:03 a.m. through July 18 at 9:32 p.m. Cell site tower activations or "pings" reflected travel to and from Illinois, including at 1:34 a.m. near

Chicago and 5:33 a.m. near an Elgin cell tower. In contrast, no calls were made from or answered by defendant's iPhone between July 17 at 10:58 a.m. through July 18 at 6:35 p.m., nor were any messages sent by his iPhone during that almost 31.5-hour period. Defendant did not respond to any calls, texts, or voicemails that were left on his iPhone beginning at 10 a.m. on July 18, until later that evening. Jennifer thought it unusual that defendant did not respond to her texts and calls, because he always had his iPhone with him. According to Kimberly, when she ultimately spoke with defendant, he had a normal affect and tone.

¶ 37    Evidence was received that Frisco, Texas, is 924.5 miles from East Dundee (or around 1849 miles round trip), and the drive between the two cities takes around 13 hours and 54 minutes. The rental car odometer had 23,529 miles on it when returned and, again, when first rented, the odometer read 21,609 miles (23,529-21,609 = 1920). Exhaustive forensic testing of the rental car, in sum, resulted in no particularly probative evidence.

¶ 38                          D. Summary of Financial Evidence

¶ 39    A significant portion of the trial related to the State's theory that defendant was motivated to murder Darrington to obtain his inheritance. Thus, many witnesses and exhibits concerned defendant's finances and expenses related to escorts and prostitutes, as well as Darrington's finances and her generosity in giving defendant money. The evidence overall showed that defendant had requested loans and/or received money from his family for various reasons over the years. In 2004, he asked Angela and Fritz for money to buy a house, and they paid off $40,000 in his credit-card debt; in 2006, he asked them for a loan for a new mortgage after a home fire, and they gave him more than $100,000, which he paid back by borrowing money from Jennifer's parents; and, in 2012, he asked them to loan him $200,000 and $110,000 for a start-up business, which they refused. After refusing him money in 2012, Angela's relationship with defendant

became strained. Angela did not approve of Darrington giving defendant money to "bail him out." Angela was Darrington's power of attorney and had created the online account for Darrington's credit card, but she explained that Darrington handled her own finances, and Angela denied seeing Darrington's credit-card bills, accessing her financial documents, or having knowledge of her finances or the value of her estate. According to an attorney hired to help administer the estate, the value of Darrington's estate could not be determined simply by reading the will and trust documents. It was ultimately determined, however, that Darrington's trust had a total value of around $807,000, including the appraised value of her house, and that defendant and Kimberly would each inherit around $305,000-$315,000. Darrington's life-insurance policies had death benefits totaling $350,000.

¶ 40 In 2006, after his house fire, defendant asked Darrington to mortgage her home and lend him $150,000, which she did not do because she was afraid to mortgage the home at her age. She did, however, give him her credit-card number and sent him money, and their bank statements reflected that, between January and June 2014, defendant charged more than $27,000 to Darrington's credit card. There were no charges by defendant after June 17, 2014. Darrington paid each of the credit card statements on which those charges appeared. Darrington also gave Kimberly her credit-card number, which she used to make purchases for Darrington and work, but paid her back and did it so that Darrington could acquire the reward airline miles associated with the card.

¶ 41 Defendant asked Kimberly at various times to send money via Western Union to someone in Las Vegas, who he said was a former student he was helping out, but was actually a prostitute. Kimberly was aware, in June 2014, that there were challenges in defendant's marriage and that he was considering divorce, and they spoke about whether defendant could afford divorce. As a

follow-up to their conversations, she sent defendant a text message on June 20, 2014, concerning Texas child-support laws and that an inheritance during marriage would be considered a marital asset.

¶ 42    Defendant spent several thousands of dollars on escorts and prostitutes. One of the women testified that he paid her around $20,000 between December 2013 and June 2014. He also helped her family move from Las Vegas to Missouri and was trying to set up a payment plan with her husband to be reimbursed; in July 2104, however, he told her she no longer needed to worry about paying him back. Her husband, however, testified that defendant did not forgive the debt but, rather, told them to pay him back when he could. A second woman estimated that, from November or December 2013 through July 2014, defendant paid her between $20,000 and $25,000 for her escort services, not including the gifts he bought her (laptop, cell phone, car maintenance, clothing, lingerie, sex toys, and summer tuition). In the summer of 2014, he paid her $3700 in cash and Visa gift cards and $800 toward her legal fees. The escort testified that, shortly before the summer of 2014, defendant told her that he wanted to pay off his home and give his wife money to care for their daughters so that he could be a free man. Defendant frequently conducted his transactions using pre-paid gift cards, MoneyGram, Western Union, Square, Green Dot and PayPal.

¶ 43    Jennifer testified that she had questioned defendant several times as to whether he was cheating on her, and he denied it. Further, when she asked defendant about call and text activity to a Las Vegas phone number at strange hours, he told her he had loaned $3000 to a former student, which upset Jennifer, because defendant had denied her prior request to loan her sister some money. Jennifer let defendant handle all of the finances, and she testified that she did not know, until September 2014, that they were $160,000 in arrears on their mortgage payments, that their house was in foreclosure, and that they had unpaid property taxes. There had been attempts to

enjoin the foreclosure and efforts at loan modification, but the foreclosure process was continuous from 2010 to 2014. Jennifer was still living in the house at the time of trial, but the mortgage (which was solely in her name because she was the primary breadwinner when they moved to Texas) was still in arrears and she filed for bankruptcy. Jennifer also testified that, without her authorization, defendant maxed-out two credit cards that she kept for emergencies, $80,000 disappeared from her individual retirement account, and a roofer who had performed repairs in the spring of 2014 had not been paid, despite their having received a $19,000 insurance settlement. Defendant told Jennifer that his BMW monthly payment was around $400, when it was really $689 monthly. She thought, with her base salary at $135,000 and defendant's salary around $70,000, that they had enough money to pay their bills. Defendant and Jennifer divorced on December 3, 2015.

¶ 44    During deliberations, the jury asked to see the cell tower "ping" PowerPoint presentation and location of the 5:33 a.m. "ping" from July 18. Ultimately, over defendant's objection, the jury was shown the PowerPoint presentation. It later returned a guilty verdict.

¶ 45    On March 23, 2017, the court denied defendant's post-trial motion and sentenced him to 45 years' imprisonment. On April 13, 2017, the court denied defendant's motion to reconsider the sentence. Defendant appeals.

¶ 46                                    II. ANALYSIS

¶ 47    Defendant challenges the sufficiency of the evidence that gave rise to his conviction. He argues that his conviction rests solely on circumstantial evidence that was inconclusive, misleading, and established only that he was one of many people who had the opportunity to commit the offense. He notes that Darrington's time of death was never established, beyond her death having occurred between 7:53 p.m. on July 17 (when she left a voicemail on the neighbor's

machine) and 9:30 a.m. on July 18 (when she was found). Defendant concedes that cell site tower activation evidence suggested that he was near East Dundee the morning of July 18; however, he contends that "no evidence put him at the crime scene at any point in the nearly 14-hour time frame in which Darrington was killed." He further contends that his "explanation to Kratz that he traveled to Illinois to meet with a friend was also entirely reasonable," given that he grew up in the Dundee area and later lived in Elgin and then Huntley until 2006. Defendant asserts that his marital issues and desire to conceal his activities from Jennifer were supported by the record. Defendant notes that his family members were quick to cast suspicion on him and, thereafter, that investigators did not subject them to the same surveillance and investigative techniques that he endured, even though Angela and Kimberly both lived close to Darrington.

¶ 48 In addition, defendant finds significant that the murder weapon was never identified, and he challenges the import of Kalelkar's testimony that the Recon 1 knife found in his duffel bag, which tested negative for the presence of blood, could have "perfectly" caused the wound, given that: (1) she never compared that knife to the wound; (2) she was unaware that there were knives found in Darrington's home; and (3) none of the knives found in Darrington's home were taken into evidence or submitted for forensic testing. Similarly, defendant takes issue with the investigation's failure to test fingernail scrapings, bedding, or swabs from the sexual-assault kit, on the basis that there were no signs of struggle or sexual assault, when, in fact, there was fresh bruising on Darrington's hands and face and she had a chipped thumbnail. He also notes that, despite exhaustive testing, no probative evidence was found in the rental car.

¶ 49 Finally, defendant argues that the financial-motive evidence against him was misleading and reflects the "tunnel vision" used to prosecute him. He notes that the financial evidence did not reflect any urgent, pressing need for his inheritance and, to the contrary, it showed that

Darrington was generous with him and kept him flush with cash while he was living, "so he had no reason to seek out his inheritance." If motivated by urgent financial need, he argues, the murderer would not have left thousands of dollars in cash, gift cards, and jewelry in her house. Defendant challenges specific pieces of the financial evidence presented against him and, in sum, argues that the sum of the evidence simply did not support the State's attempt to imply that he was under severe financial strain at the time of the offense. Moreover, defendant suggests that, despite their testimonies, Angela and Kimberly were, in fact, aware of Darrington's finances and that, as Darrington willingly gave him money, effectively reducing their inheritance, they resented it. He notes that Kimberly will now presumably inherit a larger portion of Darrington's estate. "Others stood to gain just as much from Darrington's death, and [defendant] actually benefitted much more from Darrington's generosity in life." In sum, defendant argues:

"[Defendant's] family members made a concerted effort to cast suspicion on him, and investigators scrutinized him far more than anyone else. The secretive actions he took amidst the cloud of his infidelities and impending divorce were given a nefarious cast, he was vilified for his involvement with escorts, and his sullied character was substituted for actual proof. [Defendant] was no closer to the crime scene than Angela or Kimberly in the relevant time frame, which spanned nearly 14 hours, and investigators seemed to discount from the start the possibility that a stranger killed Darrington. No forensic evidence tied [defendant] to the crime scene, and several potential sources of forensic evidence that might have helped to identify Darrington's killer were ignored. Although the State suggested that a random knife found in [defendant's] house was the murder weapon, it was never positively identified as such, and none of the testing to which it was subjected supported the State's theory. In sum, the purely circumstantial evidence on which

[defendant's] conviction rests is insufficient to prove that he committed first degree murder beyond a reasonable doubt, and his conviction should therefore be reversed."

¶ 50     When faced with a challenge to the sufficiency of the evidence, we ask only whether, after viewing all of the evidence in the light most favorable to the State, any rational fact finder could have found the elements of the offense proved beyond a reasonable doubt. *People v. Ward*, 154 Ill. 2d 272, 326 (1992); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The fact finder is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence. *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). It is not our function to retry the defendant. *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004).

¶ 51     Here, defendant was charged with first-degree murder in violation of section 9-1(a)(2) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(2) (West 2012)). Section 9-1(a)(2) states that, one who kills a person without lawful justification, commits first-degree murder if, in performing the acts that cause the death, he or she knows that such acts create a strong probability of death or great bodily harm. Moreover:

> "Proof of an offense requires proof of two concepts: first, that a crime occurred, the *corpus delicti*, and second, that it was committed by the person charged. *People v. Ehlert*, 211 Ill. 2d 192, 202 (2004). In a prosecution for murder, the *corpus delicti* is the fact of death, along with the fact that death was due to criminal agency. *Id*. [Where] there is no direct evidence linking [the defendant to the victim's] death[,] *** circumstantial evidence is sufficient to sustain a criminal conviction if the evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged. *People v. Hall*, 194 Ill. 2d 305, 330 (2000). The trier of fact does not need to be satisfied beyond a reasonable doubt as to each

link in the chain of circumstances, but rather that all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Id.*" *People v. McVay*, 2019 IL App (3d) 150821, ¶ 40.

¶ 52   Here, we reject defendant's challenge to the sufficiency of the evidence. A rational factfinder could have found that the circumstantial evidence sufficiently proved beyond a reasonable doubt that the crime was committed by defendant. Although defendant challenges specific pieces of evidence and their import or lack thereof, as noted above, the jury needed to be satisfied only that the evidence taken *as a whole* reflected guilt beyond a reasonable doubt. For example, the jury could have discounted the absence of cobwebs in front of the key (in the electrical box) as being either of no import or, possibly, consistent with an attempt to direct suspicion away from those who actually owned keys. Similarly, the jury could have reasonably disregarded the wood shard on the garage floor as normal wear and tear for the home, given that there were no other signs of forced entry. In addition, the jury could have found reasonable investigators' explanations that Angela's and Kimberly's whereabouts the night of the murder were established and needed no further inquiry, nor did the vague descriptions of two people in Darrington's yard or a female jogger give rise to a need to investigate further, as Darrington lived across the street from a park frequented by joggers. As to defendant's implication that investigators targeted him solely because his family quickly cast suspicion upon him, we reject this argument because it was reasonable for investigators to interview defendant, given his relationship to Darrington and that he was co-executor of her estate. That additional, more focused investigation into his statement and whereabouts were triggered from the initial interview was a direct result of his own inconsistencies in answering the questions.

¶ 53    While we acknowledge that there was no forensic evidence (such as DNA, fingerprints, etc.) directly linking defendant to the murder, the jury could have reasonably determined that the knife found in defendant's bag was more likely to have committed a stab wound of the width and depth suffered by Darrington than those found in her home.  Based on this court's review of the record, the photographed knives from Darrington's home consisted solely of standard dining knives and a few with serrated edges.  According to Kalelkar, the stab wound was "sharp," not jagged consistent with a serrated knife.  It was also a few inches wide, which was consistent with the size of the straight-edged knife found in a Ziploc bag in a duffle bag in defendant's home.  Moreover, although no DNA was suitable for comparison, a human, Caucasian, head hair was found on defendant's knife, which the jury could have found notable, given that Darrington, who was Caucasian, was stabbed in the neck.

¶ 54    Defendant asserts that his position that he was having marital issues and wanted to hide his actions from Jennifer was supported by the record, but the jury could have rejected that explanation as simply unlikely given the lengths defendant apparently took to discuss divorce with an unidentified individual.  Indeed, defendant speculates that there could have been other reasons for his overnight trip to Illinois, such as "visiting a friend in a park,'" which he asserts was "entirely reasonable."  We not only disagree that the explanation was reasonable, the jury was simply not required to accept that explanation.  We agree with the State:  "[it was reasonable for the jury to conclude [that] defendant did not leave his iPhone at home intentionally, buy a prepaid cell phone, pay for the trip on gift card, have someone rent a vehicle for him, and make a 30-hour round trip drive just to speak to an unidentified friend in an Illinois park in the middle of the night."  See, *e.g.*, *People v. Evans*, 209 Ill. 2d 194, 212 (2004) (factfinder not obliged to accept any proffered explanation compatible with defendant's innocence); *People v. Milka*, 336 Ill. App. 3d 206, 228

(2003) (jury was free to accept or reject explanations for defendant's statement). Certainly, even if defendant needed a prepaid, untraceable phone to hide from Jennifer, the jury could have rejected the notion that a 30-hour trip in the middle of the night to Illinois, coincidentally during the time frame Darrington was murdered, was reasonable for purposes of discussing divorce. Even setting aside possible other reasons for a clandestine trip to Illinois, the jury was not required to reject the most obvious and plausible one.

¶ 55    Regardless of motive, the evidence reflected at a *minimum* that, on the night of his grandmother's murder, defendant, in a car rented in another person's name and using a prepaid phone and gift card, was in Illinois and, at 3:13 a.m. on July 18, made a purchase in West Dundee (less than three miles from Angela's house, which was 10 minutes away from Darrington's house). While we do not recount all examples here, the jury could have found that defendant's explanations to family, friends, and others were repeatedly belied by the evidence. For example, he told Daloise that he wanted a rental car to move items without Jennifer knowing, while he told Kratz that he wanted it to travel to Arizona to talk with his father. Neither statement was true. Defendant told investigators that he was in Texas on July 17-18. That was not true. Defendant told Kimberly and Jennifer that money and phone calls funneled to Las Vegas were helping a former student in need, when really they were going to prostitutes. He told Jennifer that his monthly car payment was around $400, that the mortgage had been paid, and that he was not cheating on her. None of that was true. Thus, when defendant argued that there was no motive to kill his grandmother, financial or otherwise, the jury could have found his argument not credible, in light of the totality of the evidence, which included a clandestine trip to Illinois in the middle of the night with extensive attempts to cover his tracks, a weapon that could have caused the fatal injury, a history of big spending and financial wheeling and dealing, and explanations routinely belied by the evidence.

¶ 56    In sum, defendant's numerous arguments relating to the alleged weaknesses in the evidence and the overall sufficiency of the State's case were presented to and rejected by the jury. *People v. Baugh*, 358 Ill. App. 3d 718, 737 (2005).  Viewed in a light most favorable to the State, the evidence was sufficient to sustain defendant's conviction.

¶ 57                                          III. CONCLUSION

¶ 58    For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

¶ 59    Affirmed.